**Linda VAIZBURD and Arkady Vaizburd, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 00–136L.

United States Court of Federal Claims.

June 30, 2003.

Arkady Vaizburd, pro se, Boynton Beach, Florida, for plaintiffs.

Alan Brenner, with whom was Jo–Ann M. Shyloski, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

This is an action under the Takings Clause of the Fifth Amendment. Plaintiffs seek compensation for a physical taking resulting from the deposition of sand on their property, which they attribute to actions of the United States Army Corps of Engineers. Trial was held in New York City from April 8–14, 2003. Plaintiffs, Arkady and Linda Vaizburd, appear *pro se.*[1] After trial, plaintiffs filed a motion to reopen the record to include new information and to impose sanctions against defendant. For the reasons set out below, we reopen the record for the limited purpose of including recent photographs offered by plaintiff, but deny the motion for sanctions or to reopen in other respects. We also find that plaintiffs have proven the government's responsibility for the physical processes which have impacted their property. What has not been established, however, is that the impact is substantial enough to obligate the government to pay compensation pursuant to the Takings Clause.

## BACKGROUND

Plaintiffs are owners of a house in Sea Gate, a private, gated community in Brooklyn, New York. Sea Gate occupies the western end of the Coney Island peninsula. The south side fronts on the Coney Island Channel and is exposed to the open ocean. The north side faces Gravesend Bay and New

York City. Sea Gate, as a development, dates back over one hundred years. Plaintiffs' house, which is located at 3861 Oceanview Avenue, was built approximately forty years ago. Oceanview Avenue runs along Gravesend Bay. Lot 3, on which plaintiffs' house is built, is 40 feet wide and 110 feet deep. The rear property line is marked by a wooden bulkhead, approximately six feet high. Plaintiffs have an impressive view of Staten Island and New York harbor.

Plaintiffs bought their home for approximately $320,000 in 1989. Included in the purchase was an additional, submerged, seaward lot, number 103, directly behind lot 3. Lot 103 is 40 feet wide and approximately 400 feet long. At the time of the purchase, Lot 103 was completely submerged, although there was testimony that at low tide there was exposed beach immediately adjacent to the bulkhead. Over the years, unlike some of their neighbors, plaintiffs have continued to pay property taxes on their seaward lot. The result is that of the approximately thirty homes on Oceanview Avenue which front the water, plaintiffs own one of the few seaward lots.

In 1989, immediately on the other side of the bulkhead, there was approximately three or four feet of water, at least during all but low tides. This was sufficient depth to float a twenty five foot motorboat. Plaintiffs kept such a motorboat suspended from the bulkhead on a boat lift. Mr. Vaizburd is an avid fisherman, and the fact that the lot gave direct access to the water was the critical factor in his wanting to buy the house. One of plaintiffs' exhibits, a videotape made in the late 1980's, shows Mr. Vaizburd fishing directly from the bulkhead.

Sea Gate Community controls a private beach on the southern side of Coney Island, facing the ocean. This beach runs west from 37th Street for approximately half a mile to Norton Point, at the western tip of the peninsula. For several years, the Sea Gate beach, along with the public beach running for sev-

---

1. Despite lack of counsel, plaintiffs' legal argument and presentation did not suffer. They understood the relevant principles and Arkady Vaizburd, who handled the courtroom presentation, was very skilled at presenting evidence and making relevant objections. The decision not to hire a professional appraiser, however, may not have been as harmless.

eral miles east of 37th Street, had been experiencing severe erosion. This prompted Congress to authorize the United States Army Corps of Engineers, New York District (the Corps), to add substantially to the length and bulk of an existing groin, or jetty, at 37th street and to replenish the beaches with new sand. This work was completed in January 1995. The result was a rock groin 860 feet in length and the placement of over 3 million cubic yards of sand on both the public beach and Sea Gate beach.

Mr. Joseph Vietri, Deputy Chief of the Planning Division of the Corps' New York branch was called to testify by both parties. He explained that the Corps' preference had been to build a new groin further to the west, near Norton Point. Fierce opposition from Sea Gate Community, however, prompted the agency to enhance the existing structure. The net result of that choice is that the groin does not provide protection to Sea Gate beach, which is on the western, or down drift side of the groin.

Diane Rahoy also testified. She is a staff engineer for the Corps' New York District. She has extensive experience with the Coney Island project. She explained that the Coney Island beach renourishment project has no navigational purpose. It was intended solely to protect the beach.

Within two years of completion of the project, the Corps began receiving complaints from water-front homeowners along Oceanview Avenue that water-born sand, which the homeowners claimed originated on the Coney Island beaches, was creating a beach on the Gravesend shore. This claim is supported by aerial photographs, which show that, as of March 1995, there is still water up to the bulkhead behind plaintiffs' home. A year later, however, a thin but noticeable margin of sand appears. Simultaneously, the Sea Gate beach shrinks in the photographs. By August 1998, the sand behind the houses on Oceanview Avenue is almost as wide as the Sea Gate beach. As of April 1999 the sand accumulation was wider than most of Sea Gate beach. The court visited the Vaizburd home at the end of August 2001 and again during the trial in April of this year. Noticeably more sand had built up behind the

plaintiffs' house during the year and a half interval. It appeared that about four hundred feet of beach had accumulated.

It is not mere coincidence that, as the Sea Gate beach disappears, a beach of sorts has developed behind the houses of plaintiffs and their neighbors. The Corps has not contested the allegation that the Coney Island project has caused the accumulation of sand behind Oceanview Avenue. Indeed, it would be difficult to do so. The project resulted in the placement of more than 3 million cubic yards of sand on Coney Island Beach by the end of 1995. By 1997, it is estimated that over 620,000 cubic yards of this sand had been lost from the project. Ms. Rahoy explained that there is a natural scour along the Coney Island shore. Although most of the sand is carried along in the Coney Island Channel out to sea or into New York Harbor, some of that sand, particularly sand from Sea Gate beach, remains close to shore and migrates into Gravesend Bay and accumulates behind the houses on Oceanview Avenue. Ms. Rahoy further explained that, although there is some minor natural scour in Gravesend Bay, the quantity of sand now present will, even assuming no renourishment on the Coney Island side, still be there for as long as forty years.

Anthony Ciora also testified. He is the Corps' Project Manager for the Coney Island project. He explained that the public beach is relatively stable and has not degraded faster than anticipated. There is, however, excessive erosion taking place along the Sea Gate beach. He estimated that there is currently about 30,000 cubic yards of sand on the Gravesend Bay side of Coney Island. Whatever its immediate source, there is no question that the sand behind the houses fronting Gravesend Bay is coming from sand placed by the Corps.

It is also undisputed that the Corps is committed to maintaining Sea Gate beach, and thus, because of the continuing erosion, plans to place more sand there. Ms. Rahoy testified that since January 1995, sand has been deposited on the Beach Club (downdrift) side of the groin on five occasions, although not always by the Corps.

The Corps and the City of New York also have made some efforts to remove the sand behind the homes on Oceanview Drive, although the parties disagree on the circumstances. In 1999, the Corps anticipated removing 20,000 cubic yards from the sand accumulating on Gravesend Bay and moving it to Sea Gate beach. The plan was to use land-based equipment. Mr. Stanley Nuremburg, a Corps real estate specialist, testified that, because a small number of the Oceanview Avenue residents owned the seaward lots (including the plaintiffs), the Corps attempted to obtain their permission for access. Plaintiffs and at least one other owner refused permission. Because of the delay this precipitated and the need to renourish Sea Gate beach before the summer recreational season, the effort was abandoned. The City of New York, however, performed a similar operation in 2000, although it removed less sand than had been planned by the Corps. It was not explained whether the City attempted to obtain permission from plaintiffs. It must be noted, in any event, that whatever the Corps planned to do by way of sand removal would not have restored the pre-taking condition-lot 103 would not have been under-water. Moreover, the operation would have to be repeated periodically to prevent accumulation of sand. What it would have done is reduce the volume of sand blowing across plaintiffs' bulkhead and into their backyard and house.

In October 2000, the Corps undertook a second effort to renourish the Sea Gate beach, and coincidentally, protect Gravesend Bay from further sand deposition. It was an ocean-based operation involving removal of 100,000 cubic yards of sand from the waters immediately adjacent to Norton Point and depositing it on the beach at Sea Gate. The project was successful, creating a trough or depression off Norton Point which hopefully will intercept most of the sand eroding from Sea Gate beach.

Mr. Joseph Vietri explained that the only long term solution to the Gravesend problem will be implementation of the Corps' current plan to construct a series of "T-groins" on Sea Gate beach. There would be five of these structures between the 37th Street groin and Norton Point. They would be shorter than the existing groin, and, as the name implies, with a "T" shape, designed to trap sand. The project has received Congressional approval, but has not been funded. The Corps currently estimates that the project will be built in 2005.

Whether the T-groins are ultimately built, however, the Corps is committed, according to Mr. Vietri's colleague, Mr. Ciora, to maintain Sea Gate beach at its pre–1995 levels. This is apparently the case, as Dr. Victor Goldsmith, plaintiffs' expert on causation, testified that on the eve of trial someone was moving sand from the public beach to Sea Gate beach. In addition, the new evidence Mr. Vaizburd offered after the close of trial, and which the court admitted, appears to show new sand being piled immediately on the Sea Gate side of the fence bisecting the center of the groin.[2] The photographs show Corps trucks on the public beach side of the fence.

*The Impact on Plaintiffs' Property*

Plaintiffs' assertion of a taking has multiple components. One aspect is the loss of ability to fish or boat directly from lot 3. The sand on lot 103 blocks direct water access. Plaintiffs owned more than one boat during the time they lived on Oceanview Avenue. Over time, they "traded up," buying larger boats which were maintained at marinas some distance from the house. It is not clear whether the larger boats plaintiffs later purchased could have been kept on the same boat lift operated from the bulkhead, even assuming the water was still present. It is clear, in any event, that by the end of 1995 the boat lift was useless and Mr. Vaizburd could no longer fish from his bulkhead, forcing him to house his boats at a marina.

There are other effects of the sand. The court heard testimony from several witnesses

---

2. Plaintiffs argue that this demonstrates that Mr. Ciora was wrong, or worse, when he testified that the Corps has no immediate plans to replenish Sea Gate beach. The court has reviewed Mr. Ciora's testimony and sees no reason to further reopen the record. He made it clear that the Corps would replenish the beach on an as-needed basis. The critical fact is that the dynamics of beach renourishment, erosion and deposition on Gravesend Beach are well-established.

about the "aeolian effect"-the movement of sand by wind. Because Gravesend Bay offers a relatively long, unimpeded wind approach to Oceanview Avenue and because the sand accumulating on the beach is relatively fine, the wind has a remarkable ability to march sand up from the beach, across the bulkheads and houses, and into the neighborhood. This is particularly true in the winter, when the prevailing winds are stronger and come from the northwest toward the shore. There is sufficient sand and wind that sand will, certainly within one winter season, build up to the top of any bulkhead extension currently in place along the back of Oceanview Avenue residences. When it builds up to the top of any such structure, it will begin to overtop the bulkhead and enter the adjoining yard, house and street.

Plaintiffs, like most of their neighbors, have jury-rigged different means to keep sand from getting into their backyards. Plaintiffs erected a glass extension of the bulkhead, but this merely means the sand has farther to go before it inevitably reaches the top, after which it blows into the backyard of plaintiffs' home, into their gutters and into the street beyond. At the time of the second court site visit, the entire backyard was full of sand, up to three feet deep in places. Because plaintiffs built two narrow extensions to the sides of their home that go to the fences which separate their home from both neighbors (in violation of zoning limitations), the sand is trapped against the house. Sand was stacked up at least five feet in one of these corners, blocking the side doors and windows of the downstairs sun room.

Plaintiffs allege that sand blowing from the beach infiltrates their backyard, impedes the gutters and windows, and, but for periodic removal, would block portions of the downstairs doors and windows. There was a substantial amount of sand visible in plaintiffs' gutters and there was sand in the tracks of the doors and windows. Dr. Goldsmith testified that the sand incursion makes the house "uninhabitable." In his view, it is only a matter of time before all the houses along

the bay on Oceanview Avenue will be completely engulfed by sand.

Plaintiffs' moved from their home in Sea Gate to Florida in December 2000. This move was motivated in part by continued disappointment over the loss of immediate access to the ocean. It was also, they say, prompted by recurrent problems with the backup of sewage and storm drainage runoff into their downstairs bathroom. Plaintiffs attribute this problem directly to the increased level of sand in the unified storm drain-sewage system which operates throughout most of Sea Gate Community. Plaintiffs allege that sand clogs the sewer system along Oceanview Avenue, causing the repeated backup of sewage into plaintiffs' downstairs bathroom.

During the two site visits, sand was plainly visible in the storm drains on Oceanview Avenue, particularly at the eastern end. There was a large pile of drifted sand located between the street and the bay which appears to have accumulated within the past few years. Plaintiffs allege that sand from this pile has unimpeded access to the storm drains at the eastern end of the street, which is down-drainage from plaintiffs' house.

Plaintiffs are apparently the only residents along Oceanview Avenue who have "evacuated" their home. Certainly every other house on the street appears to be occupied. Michael Breslov, who also lives on Oceanview Avenue, and who is currently President of the Sea Gate Community Association, testified that he does not recall other residents of Oceanview Avenue complaining about sewer backups. The homes to the east of plaintiffs would seem to be even more at risk, yet they are all inhabited.[3] Mr. Breslov acknowledged problems with the aged Sea Gate storm/sanitary sewer drainage system, but said that the association has had problems with the system both before and after the Corps did its work. Mr. Breslov indicated that some of the residents had installed a one-way "check valve" to prevent sewage or street runoff from backing up a line into a house, in the event the main line in the street

---

**3.** Mr. Breslov testified that he knew of no one else on the street who had vacated their homes because they became uninhabitable.

is blocked. Such a valve would have the effect, during high water, of preventing sewage backup, although the plumbing from the house would not drain during such events. The sewage outfall line draining plaintiffs' home does not have such a valve.

The fact that plaintiffs appear to be the only residents so dramatically affected by water backup into their home may have an explanation, however. During trial, the court heard from John Apice, the owner and operator of Calvert Sewer Company, which does business as Sewer King. He has been in the business of maintaining sewer and storm drainage lines for over twenty years, including the Sea Gate Community for many of those years. Sea Gate currently has a limited capacity of its own to maintain "public" sewer lines, but it frequently calls in Mr. Apice to handle more substantial problems.

Mr. Apice apparently surprised both parties by testifying that, earlier this year, he may have fixed a recurrent problem which he had been asked to address in the area between plaintiffs' house and the eastern end of Oceanview Avenue. He had been called in on several prior occasions to jet out the trash from the drainage line immediately below the plaintiffs' property. He testified that the obstruction appeared to be the usual items which block a sewer, and not sand. He could produce some temporary relief for sewer backups by dislodging trash lodged behind the obstruction. He had notified Sea Gate management that, because the problem was recurrent, he should be tasked to check it out more thoroughly with a remote camera. It was only earlier this year that he finally was hired to do so. He explained that when he examined the line more carefully, he encountered a piece of metal, approximately eight inches long, which was wedged in the pipe, causing substantial blockage. The pipe is approximately ten inches in diameter. The piece of metal was a rotor, the blade-end of a device which is run through the line to clean it out. Apparently whoever had used the rotor had jammed it and broken it off.

This obstructing rotor was immediately below plaintiffs' house. In light of this obstruction, the lack of a check valve, and the absence of serious complaints from other residents, there is strong reason to think plaintiffs' problems with sewage backup were not caused by the Corps. Rather, they were the unfortunate result of a temporary blockage of a system which was already problematic for reasons unrelated to the additional sand.

### Sand Removal Efforts

As explained above, the Corps and the City of New York have made occasional efforts to remove sand from the Gravesend Bay area. In addition, plaintiffs have paid to have sand removed at least once from their back yard. On other occasions, Mr. Vaizburd himself has shoveled sand away from behind the top of the bulkhead. This is a task that has to be repeated several times a year, particularly in the winter.

Michael Breslov testified that he pays every year to have sand removed to maintain the level well below his bulkhead. This expenditure, in effect, has become a cost to Breslov to live where he does. Apparently some of the other owners along Oceanview Avenue have also paid to have sand removed on occasion.

### Loss of Privacy and Presence of Trash on the Beach

Plaintiffs also assert a loss of privacy. It is now possible, although not legal, for the public to walk on lot 103 behind plaintiffs' house, something that was physically impossible prior to the creation of the beach. An additional element of the latter claim is that flotsam and jetsam, along with garbage and sewage, are now routinely deposited on lot 103. In the past, this debris may have been present in the water, but it floated past on the tides and had no sand in which to become imbedded.

### Offsetting Benefits

The Corps has attempted to demonstrate that despite the disadvantages of the new beach, it has, on net, a beneficial effect for two reasons. One, is that some people prefer beach, as opposed to water, behind their homes. The other is that the sand serves as something of a buffer against the worst effects of serious storms. With respect to the former, we note two things. First, the beach behind plaintiffs' house is unattractive. The

court has seen it on two occasions. It is littered with trash and wood. Some of the wood consists of timbers or dislocated pilings of very substantial size. There were traces of dead animals in the sand, as well as a large assortment of garbage. Mr. Breslov testified that two human corpses had washed up on the beach. The beach, in short, would not make the front of a tourist brochure. It is hardly pristine. Second, we believe that rather than rely on subjective preferences as to who prefers beach front to bay front, the best indicators are the before and after appraisals, which intrinsically incorporate such factors.

As to the second phenomenon-protection against storm damage-the evidence is clear that plaintiffs' home is better protected against unusual storms now than it was in 1994. This is due to the fact that the real risk from a storm surge is wave action. The larger the wave, the greater the damage to property. Potential wave height, however, is correlated to the depth of water; the deeper the water, the higher the wave. Because there is now sand up to the highest levels of the bulkhead, wave height potential is reduced.

This is not a trivial effect. In 1992, a "storm of the century" hit the Coney Island area. It caused enormous damage along the coast, including serious damage along Oceanview Avenue. Michael Breslov testified that an automobile and logs ended up in the backyards along Oceanview Avenue. As Mr. Vietri testified, similar "storms of the century" have occurred several times within the past twenty years.

*Remedial Efforts*

Government counsel argued in closing that the court could assume that the Corps or the City of New York would periodically attempt to remove some of the sand and thus minimize the impact along Oceanview Avenue. The court certainly hopes that is the case. If the argument is advanced as an answer to a

taking claim, however, it must fail for three reasons. First, the proof was insufficient for the court to conclude with any certainty that it is likely that sand will be removed on a regular basis. Second, even if it could be said with certainty that the Corps will remove sufficient sand from lot 103 to prevent it from overtopping the bulkhead and coming into plaintiffs' house, the access easement alone required to conduct sand removal would constitute an estate in land for which plaintiffs could be compensated. Finally, any efforts at removal were directed at reducing the accumulated sand, not eliminating it. Given the air and water dynamics at work, the sand would reappear.

In short, the court is forced to assume that the plaintiffs are burdened with the continuing presence of large quantities of sand on both lot 3 and lot 103.

Nor is the court willing to make any assumptions about the construction of the proposed "T-groins." There is many a "slip twixt cup and lip" and the mere possibility of remedial structures, while hopeful, is insufficient to preclude a finding that the sand is an inevitably recurring phenomenon.[4]

## DISCUSSION

The Takings Clause of the Fifth Amendment implicitly recognizes the power of the federal government to undertake acts for the public good which result in a total or partial taking of private property. What it provides, however, is that when this occurs, just compensation must be paid.

Plaintiffs allege a physical taking by the United States. The case is thus controlled by the decision of our predecessor court in *Coates v. United States*, 117 Ct.Cl. 795, 93 F.Supp. 637 (1950): "We can conceive of no more direct invasion of a man's property than the alleged deposit upon it of several hundred thousand tons of sand as a direct consequence of work done to the adjacent

4. We note that Dr. Goldsmith took a dim view of the utility of these structures. Because "of the essentially unlimited supply of sand available from the up-drift side of the 'Groin' (east side), by-passing will continue unabated, and [sand] will continue its journey to be deposited on Oceanview Avenue." The evidence, however, was that the primary source for sand movement to Gravesend Bay was the down-drift, or Sea Gate beach side of the groin. The evidence, in other words, supports the Corps' hope that the T-groins would substantially ameliorate the problem, once built.

stream." *Id.* at 796. *Coates* is premised upon the principle laid down in *Pumpelly v. G.B. & M. Canal Co.,* 80 U.S. (13 Wall.) 166, 20 L.Ed. 557 (1871), that, even though government action was taken in furtherance of power to maintain navigable waterways,

> Where real estate is actually invaded by superinduced additions of water, earth, sand or other material, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution . . . .

*Id.,* 80 U.S. at 181.

■ The quotation above contains a restrictive principle which turns out to be very relevant to this case: the impact must effectually impair the usefulness of the property. To be compensable, an indirect "invasion" by sand has to be the result of affirmative government action and has to be substantial and continuing. As the Court taught in *Gibson v. United States,* 166 U.S. 269, 276, 17 S.Ct. 578, 41 L.Ed. 996 (1897): what is required is a permanent "physical invasion of the real estate of the private owner, and a practical ouster of his possession." The point at which incidental effects become a taking is the point at which there is a "serious interruption to the common and necessary use of property . . . ." *Pumpelly,* 80 U.S. at 179.

The taking does not have to be of a fee interest in land. Instead, the effects of government action are a taking "to the extent of the destruction caused." *United States v. Kansas City Ins. Co.,* 339 U.S. 799, 809, 70 S.Ct. 885, 94 L.Ed. 1277 (1950). In *United States v. Cress,* 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917), it is established that the imposition of less than a complete destruction of the value of land by superimposition of water is a taking of a partial interest:

> If any substantial enjoyment of the land still remains to the owner, it may be treated as a partial instead of a total divesting of his property in the land. The taking by condemnation of an interest less than the fee is familiar in the law of eminent domain. . . . [S]uch a right or interest will be deemed to pass as is necessary fairly to effectuate the purpose of the taking . . . .

*Id.* at 328–29, 37 S.Ct. 380.

■ The implication of these decisions is that a partial taking, i.e., the imposition of a *de facto* easement for the deposit of sand by indirect means, requires some proof of impact on the use of the property. Presumptively, the best means of measuring this impact is by appraisals of the property before and after the "taking." As will be seen below, however, the difficulty presented in this case is that plaintiffs' proof of impact fails.

## The Imposition of an Easement for Deposition of Sand

There is no question that the result of the Corps' actions here is the continuing presence of sand on plaintiffs' property. It is the inevitable and recurring result of official government action in maintaining the Coney Island beaches. The extent of the impact, at least to date, is that lot 103 is, for the foreseeable future, completely out of the water, and lot 3 is burdened by the need for constant maintenance to avoid the worst effects of drifting and blowing sand. We find that the Corps' actions here resulted in the shifting of part of the cost of addressing a public problem onto residents of Oceanview Avenue. This shifting of cost was not balanced in any sense by the plaintiffs' receipt of benefits, nor by the spreading of this cost over the entire community. The prime beneficiaries of the work were either the public at large, or the Sea Gate community at large; the only individuals to suffer the burden were water-front dwellers along Oceanview Avenue. The Corps has imposed an easement for the deposition of sand onto both lot 103 and 3.

We decline to treat the potential for storm amelioration as a reason to deny the claim. Only special, or unique-to-the-landowner effects can be considered as an offset to a damage claim. *See* 5 Nichols § 18.19[1]. Here, all the landowners along Oceanview Avenue benefit from the protection.

One troublesome issue remains with respect to the nature of the taking. Dr. Gold-

smith testified that it is only a matter of time before the houses on Oceanview Avenue will be completely "engulfed" by sand. He thought this might occur "in the order of just a few years depending on the wind." Except for the government's suggestion that the city or federal government simply would not let this happen, Dr. Goldsmith's assertion is unrebutted.

The court is not obligated to accept even unrebutted expert testimony without reservation, however. Without questioning Dr. Goldsmith's qualifications (they are impressive), the court has concerns about accepting his prediction at face value. We begin with the fact that he made only one site visit before coming to his conclusions. His only other visit took place the day before his testimony. During his first visit, Dr. Goldsmith took no rigorous measurements. He based his opinions on his visual observations, prior experience, on Corps documents, and on plaintiffs' observations. All of these are valid data sources, but strike the court as considerably less useful than the "actual measurements" Dr. Goldsmith employed on other research projects, particularly with respect to projecting the likelihood that a two-story building is going to be "engulfed."

The court is also concerned with his conclusion that the house was rendered "uninhabitable." It is not clear what his standard is for habitability, but there is no apparent reason (based on sand movement) why plaintiffs' house uniquely should be uninhabitable. Similarly, based also only on a visual inspection of the entrances to the street sewer, he concluded that the elevated water levels in the drains were "clearly a result of the aeolian sand deposits in the sewer lines." Both these assessments strike the court as unsupported by the simple observations he made. He may well be correct, but his methodology was not persuasive.

In sum, while we have no reason to question Dr. Goldsmith's more detailed testimony and conclusions, we decline to give any weight to his opinion that the house is currently "uninhabitable" because of wind blown sand. Plaintiffs' property, in short, has not been completely taken. What plaintiffs have

shown is the imposition of an easement to deposit sand on lots 3 and 103.

*Plaintiffs' Other Taking Theories*

We find that a separate theory of taking is not established either by the presence of trash in the sand on lot 103 or the possibility of trespassers onto that lot. As to the former, we believe the proper treatment of the presence of trash is as a component of the easement for the deposition of sand. Without discounting the nuisance of this flotsam and jetsam, we believe it is not a physical invasion separate from the deposit of sand. We simply note that its impact should be felt, if at all, in the process of evaluating whether the buying public agrees with the government that the "beach" adds to the value of the property.

■ As to the possibility of trespassers, we understand the mechanics of the claim to be that trespassers now have a means of accessing what was once inaccessible. People now can walk on the sand, whereas in the past, they were limited to approaching by boat (or, for the adventurous, by swimming).[5] It is now easier for people to commit such a trespass. Mr. Breslov testified that the effect was to take away the residents' privacy. Sea Gate built a high chain link fence at the east end of Oceanview Avenue to keep out the public. The continuing deposition of sand has prompted the extension of the fence, but it no longer extends to the new low tide line and it is a simple matter for someone to go around the fence and onto the beach behind plaintiffs' house.

Plaintiffs point to the decision in *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), as support for the proposition that loss of the ability to exclude is the core of a physical taking. In that case, the Corps treated prior improvements by plaintiff as a warrant for the public to access what had been a private lagoon. The Court disagreed that the plaintiff's property had lost its private character, and went on to point out that "the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this catego-

---

**5.** We note, however, that neither approach would have been a trespass in itself.

ry of interests that the Government cannot take without compensation." *Id.* at 179–80, 100 S.Ct. 383.

Unlike the circumstances in *Kaiser Aetna,* however, the government has not invited the public onto formerly private property. For the uninvited public to enter onto either lot 103 or lot 3 would involve a trespass. There was no testimony that trespassers have used the beach as a way to access lot 3, i.e., plaintiffs' house. Nor has the Corps done anything that would confuse the public into thinking that plaintiffs' home, or, for that matter, lot 103 was open to the public. The real question, therefore, is whether the indirect creation of physical access to lot 103 by pedestrian trespassers is a per se taking within the meaning of *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). We believe it is not.

Plaintiffs have not lost the legal right to exclude others. Coming onto lot 103 would constitute a trespass. Indeed, unlike in *Kaiser,* the Corps here recognizes the borders of plaintiffs' land. We think the fact of this new possibility of access thus does not add anything to the facts surrounding the deposition of sand. The increased likelihood of trespass, in other words, can be considered as a potential source of severance damages to plaintiffs' residential property.

Finally, we reject plaintiffs' theory of a complete taking due to the problems with the sewer system. The court is satisfied that, although there is a significant amount of sand entering through the storm drains and that this sand may contribute to the load on an aging sewer system, the plaintiffs have not proven that their home was "taken" in this respect. The sewage backups were more likely than not a result of the temporary blockage identified by Mr. Apice. If plaintiffs' home was uninhabitable because of the sewer problem, it cannot be attributed to the government.

In sum, we accept only plaintiffs' claim that the government may be liable for the imposition of an easement to deposit sand on both lot 3 and lot 103.

*The Date of Taking*

■ When continuing trespasses ripen into takings, the date of stabilization of impact is used for valuation purposes. *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987); *Gasser v. United States,* 14 Cl.Ct. 476, 506 (1988). The date of taking is problematic in this case because the erosion and deposition were a gradual process with cumulative effects of varying magnitude. Yet, as explained below, the assessment of damages assumes a valuation immediately before and immediately after the taking. A single date thus must be selected, although, as also explained below, it will be important, in evaluating the before and after values, to acknowledge the need to isolate the critical variables. Plaintiffs use September 30, 1995 as the date of taking. The government appraisal is based on two dates, a "before" date of April 30, 1996, and an "after" date of June 24, 1998. The court cannot use two valuation dates, however. In any event, there is nothing in the record to warrant isolating either April 30, 1996 or June 24, 1998 as the date of taking.

The earliest and most visible impact was the loss of water access from lot 3. After examining the aerial photographs, and considering the testimony of Mr. Vaizburd, the court finds that the process of accretion had sufficient impact, i.e., impeded plaintiffs' access to the water, and was sufficiently noticeable and recurring to constitute a taking, as of December 31, 1995.

*The Measure of Compensation*

■ When less than an entire interest is taken, just compensation is determined by comparing the difference in market value immediately before and immediately after the taking. *United States v. Miller,* 317 U.S. 369, 376, 63 S.Ct. 276, 87 L.Ed. 336 (1943); *see also* 5 Nichols § 18.16. The preferred method, and the one used by the parties here, is the comparable sales method. *See Gasser,* 14 Cl.Ct. at 507.

*The Plaintiffs' Appraisal*

Plaintiff Arkady Vaizburd prepared his own appraisal, relying on the proposition that a land owner is always permitted, even ab-

sent any special expertise, to offer an opinion of the value of his or her land. The weight to be given that opinion, however, depends on whether the opinion is supported by substantial data. *United States v. Sowards,* 370 F.2d 87, 92 (10th Cir.1966). In this case, plaintiff Mr. Vaizburd prepared an extensive exhibit addressing the value of the property [6] before the taking. In many respects it mimics the government's expert report. In fact, plaintiffs rely on the "after value" calculated by the government ($325,000).

Plaintiffs' before value (fixed at the asserted taking date of September 1, 1995), is calculated to be $16,229,520. This is a substantial sum, considering that they paid $320,000 for the house six years earlier. We note at the outset the higher value cannot be attributed to improvements. Plaintiffs installed new windows and doors on the back side of the house, and added the "wings" referred to earlier, but these improvements cannot be the source of a fifty-fold increase in value. This is particularly the case when the expansion was not completed under a building permit and violates the local zoning ordinance.

Plaintiffs' exaggerated view of the value of their home rests exclusively on Mr. Vaizburd's use of two home sales he contends are "comparable." Neither are in Sea Gate community, although both are in Brooklyn and both on the water. One house is in a neighborhood known as Mill Basin. Unlike Sea Gate, its water access is less desirable. It is in a dead-end slough. Nevertheless, the sale on which plaintiffs focus was a 1996 sale which plaintiffs contend netted $12,950,000.[7] The court viewed the house from the outside. It is situated on two lots. It has a permanent dock, as opposed to a lifting facility. The house itself is much larger (almost three times as much square footage), newer-appearing, and better landscaped and maintained than plaintiffs' property. In short, it seems to be a very different type of house.

The government's appraiser, Mr. Dominick Neglia, agreed. He thought that the house and the neighborhood were very different. He considers Mill Basin to be a much more expensive area. The highest sale he is aware of in Mill Basin is $7 million. Mr. Breslov explained that although he would not want to live in Mill Basin, because the water is not as clean and it is further from downtown New York, it is nevertheless viewed as a "pricier" neighborhood than Sea Gate. He may have explained one of the reasons for this indirectly: Sea Gate's infrastructure has not been well-maintained because the community has refused to assess itself sufficiently. The court's drive through the two neighborhoods would bear out that evaluation. We note also a newspaper article about Sea Gate, dated September 17, 2000 and admitted without objection, in which the median price of houses in Sea Gate was indicated at that time to be $320,000. Three houses then for sale were referenced. They ranged in price from $279,000 to $1,000,000. The latter house was plaintiffs. It did not sell.

Plaintiffs' second "before" comparable was in a neighborhood called Manhattan Beach. The house sold in May 1998 for $4,375,000. Although the house in question fronts the open ocean, it is not on the water. It was separated from the ocean by a strip of public land consisting of a path and a bulkhead. The owners, in other words, unlike plaintiffs, would not have been able to launch a boat from their property. In other respects, however, the house was much superior in size and appearance to plaintiffs. The highest sale Mr. Neglia is aware of in Manhattan Beach for 1996, closer to the date of taking, was $1,120,000. For the same year, the highest sale in Sea Gate was in the $260,000 range. The average in Manhattan Beach for that year was $250,000, while the average in Sea Gate was closer to $150,000.

In sum, we reject plaintiffs' before-taking comparables. We note, in passing, that

---

6. Both parties consider lots 3 and 103 as a single parcel. In view of the fact that lot 103 has no access independent from lot 3 and cannot be separately developed, we believe this is the correct approach.

7. The Government's appraiser attempted to introduce new information at trial indicating that this figure is seriously overstated. Because it was based on information not included in the original appraisal, allowing no opportunity for rebuttal, the court rejected that testimony.

plaintiffs' appraisal may suffer from a lack of objectivity. Mr. Vaizburd enjoyed his home very much before the sand made the bulkhead obsolete. It may have been perfect for his purposes. It is well-established, however, that the owner's unique assessment of the value of his or her property is not relevant:

> [L]oss to the owner of nontransferable values deriving from his unique need for property or idiosyncratic attachment to it, like loss due to an exercise of the police power is properly treated as part of the burden of common citizenship.

*Kimball Laundry Co. v. United States*, 338 U.S. 1, 5, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949).

*Defendant's Appraisal*

The government's appraiser, Mr. Neglia, is fully qualified as an experienced and certified appraiser. His area of specialization is Brooklyn. He has appraised many houses in the three areas of interest here: Sea Gate, Mill Basin, and Manhattan Beach.

Mr. Neglia also performed a "before and after" analysis using comparable sales. He explained what seems to be intuitively true: the best comparables in this case are house sales along Oceanview Avenue. He was able to locate five such sales for the relevant period. Because there were relatively few such sales, in addition, Mr. Neglia utilized data from four sales along Atlantic Avenue, another ocean-facing street in Sea Gate.

He constructed different before and after dates than the plaintiffs, however. For the "before" date, he used April 30, 1996. For the "after" date, he used June 24, 1998. He based these dates on instruction from counsel. These dates assume, of course, an actual date of taking somewhere in between. Straddling the suspected date of taking is understandable in a case such as this, when the impact is cumulative and no one single event constitutes a clearly identifiable taking. Unfortunately, however, a single before and after date must be chosen, and the court has found above that the taking occurred on De-

cember 31, 1995, not at some point after April 30, 1996. Mr. Neglia's before and after dates thus cannot be used.

Because pre- and post-taking comparative sales do not neatly line up immediately on either side of a taking date, the entire process of selecting a single date as a watershed is, of course, artificial. Sales will be strung out along a continuum, with the date of taking in the middle. Mr. Neglia took account of this phenomenon by adjusting the sales price for time. The further from the date of taking, the greater the required adjustment. In this case, because the court selected a date prior to Mr. Neglia's before date, the effect is simply to move one comparable sale from a position in the "after" category into the "before" category.

Using his two original dates (April 30, 1996 and June 24, 1998), Mr. Neglia determined a "before" value of $325,000 and an "after" value of $340,000. In short, he concluded that the value of the property, was unaffected by the presence of sand and the loss of access. He did not believe that overall inflation of home prices in the area would suggest that the injury is actually camouflaged, i.e., that, absent the taking, the increase would really have been greater.

In view of the court's selection of a different date of taking, during trial we asked Mr. Neglia to reposition "Comparable Before Sale No. 2" (3837 Oceanview Avenue) into the after category of sales. In addition, because the best comparables are on Oceanview Avenue itself,[8] Mr. Neglia re-ran his model to reflect only Oceanview sales, before and after December 31, 1995. He made appropriate adjustments to reflect the passage of time. He concluded that there was no financial impact because of the physical changes behind plaintiffs' house. The before and after values were both $315,000.

As indicated earlier, these figures are adjusted for time. The only possible relevant line of attack against Mr. Neglia's conclusion is that the after values were not as high as

---

**8.** While not discounting the Atlantic Avenue comparables altogether, the court was persuaded that the Oceanview properties are sufficiently distinct and that a better comparison is therefore limited to sales on plaintiffs' street. Atlantic Avenue faces open ocean and the houses there have not

been subject to the same effect as plaintiffs' property. There was beach behind the Atlantic Avenue houses before and after December 31, 1995. The critical variable, in other words, cannot be isolated.

they would have been, but for the taking. In other words, even though prices may have continued to go up after the taking, they might have gone up faster without it. This is not an argument advanced by plaintiffs, and, in any event, there is no evidence to support it. Moreover, we note that the Atlantic Avenue sales, when isolated, do not reflect a rapid general increase in value of ocean-front property in Sea Gate.

*The Unique Difficulty Here*

 We recognize that this leaves the case in an anomalous posture. The plaintiffs have satisfied every element of a claim for the taking of an easement to deposit sand, but there is no apparent damage.[9] The question thus posed here is what happens to plaintiffs' taking claim when the damages fail for lack of proof. Answering that question requires consideration of two principles which, in some respects, seem at odds. The first is that, historically, the law with respect to suits against the federal government under the Tucker Act[10] has not permitted nominal or exemplary damages. *See Nortz v. United States,* 294 U.S. 317, 327, 55 S.Ct. 428, 79 L.Ed. 907 (1935); *Marion & R.V. Ry. v. United States,* 270 U.S. 280, 282, 46 S.Ct. 253, 70 L.Ed. 585 (1926). *Nortz,* indeed, was a claim under the Takings Clause. We take it, then, that in order to recover, plaintiffs have to prove that the actions of the government resulted in a measurable decrease in what would otherwise be the value of their property.

Is this result still correct, however, in view of the holding in *Loretto,* 458 U.S. 419, 102 S.Ct. 3164? In that case, the Court concluded that permanent physical invasions, no matter how minor, constitute takings which must be compensated. The Court did not express any view on the amount of compensation. The intrusion there (a cable television line) could arguably have improved the value of the property, leaving room for the possibility of only nominal damages.[11] Does this mean that, irrespective of whether there is any market-impact on the property, there is a taking when the suit is against the United States?

We believe the answer is no. Instead, the proper synthesis of these decisions is that the waiver of sovereign immunity does not extend to nominal or exemplary damages. The landowner must prove a diminution in value before there can be a recovery. The lack of damage means the plaintiffs' claim of a taking fails.[12]

CONCLUSION

 We find that the presence of sand on plaintiffs' property is a direct result of action by the United States. The presence of sand is permanent or recurring. The plaintiffs have failed, however, to prove that the presence of this sand has diminished the value of their property. They cannot, therefore, prove a compensable taking. The Clerk is directed to dismiss the complaint. No costs.

---

9. We do not have sufficient evidence from which to fashion a remedy from the costs related to sand removal: "[C]osts to cure and other elements resultant from the taking are only admissible on the issue of just compensation if they are tied to their effect upon fair market value." Nichols on Eminent Domain, 4A § 14.A.04[2][a]. Normally they would not be independent elements of compensation, in other words, unless it can be shown that the reduced after value assumes some continuing mitigation cost.

10. 28 U.S.C. § 1491(a)(1) (2000). The Tucker Act is the court's primary jurisdictional statute. It embraces claims for Constitutional takings.

11. We recognize the Court's observation that "[n]ot every physical invasion is a taking." *Loretto,* 458 U.S. at 435 n. 12, 102 S.Ct. 3164. The Court apparently had in mind the problem of the claim that intermittent trespass or flooding was a taking: "Such temporary limitations are subject to a more complex balancing process to determine whether they are a taking. The rationale is evident: they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property ...." *Id.* In this case, of course, the court has found that the problem is not temporary. It is likely to be with the plaintiffs indefinitely.

12. This means only that the plaintiffs cannot recover on these or any other identical facts. This also means, however, that the government does not own an easement. At a minimum, this suggests that, if the facts change, a new claim would not be barred.