### Linda VAIZBURD and Arkady Vaizburd, Plaintiffs,

v.

### The UNITED STATES, Defendant.

### No. 00–136L.

United States Court of Federal Claims.

Aug. 30, 2005.

Nancie G. Marzulla, Washington D.C., for plaintiffs.

---

G. Evan Pritchard, Washington D.C., with whom was Kelly A. Johnson, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

This is an action under the Takings Clause of the Fifth Amendment. After trial, we concluded that the deposition of sand on plaintiffs' property constituted a physical invasion and a constitutional taking. Because plaintiffs were unable to establish any decline in property value, we allowed plaintiffs no recovery. *Vaizburd v. United States,* 57 Fed. Cl. 221 (2003). On appeal, the Court of Appeals for the Federal Circuit sustained the finding of a taking and various other rulings, but remanded for this court "to decide whether evidence in the existing record supports an award of compensation on a cost of cure theory." 384 F.3d 1278, 1286 (Fed.Cir. 2004). The majority rejected the dissent's view that the plaintiffs had not preserved that theory of recovery. *See* 384 F.3d at 1288. The matter has been briefed and oral argument held. For the reasons set out below, we award plaintiffs $37,058.50.

## BACKGROUND

We review certain aspects of the factual background, although knowledge of the prior opinions is assumed. These recitations do not constitute new findings. Plaintiffs, Arkady and Linda Vaizburd, who appeared *pro se* at trial, were owners of a house in Sea Gate, a private, gated community in Brooklyn, New York. Sea Gate occupies the western end of the Coney Island peninsula. The south side faces the Coney Island Channel and is exposed to the open ocean. The north side faces Gravesend Bay and New York City. Plaintiffs' house was built over forty years ago. It occupies Lot 3, which is 40 feet wide and 110 feet deep. The rear property line is marked by a wooden bulkhead, approximately six feet high.

Plaintiffs bought their home for approximately $320,000 in 1989. Included in the purchase was an additional, submerged, seaward lot, number 103, directly behind Lot 3. Lot 103 is 40 feet wide and approximately 400 feet long. At the time of the purchase, Lot 103 was completely submerged, although there was testimony that at low tide there was exposed beach immediately adjacent to the bulkhead. In 1989, there was approxi-

mately three or four feet of water on the other side of the bulkhead, at least during all but low tide. As of March 1995, there was still water up to the bulkhead behind plaintiffs' home. By August 1998, however, sand accumulation was apparent. The court visited the Vaizburd home at the end of August 2001 and again during the trial in April 2003. Noticeably more sand had built up behind the plaintiffs' house during the year and half interval. It appeared that about 400 feet of beach had accumulated. As of the date of trial, there were about 30,000 cubic yards of sand on the Gravesend Bay side of Coney Island. The deposit of sand is accompanied by the accumulation of debris, as confirmed by the court's visits to the site. Presumably, trash and debris were present in the water when Lot 103 was submerged, but it now washes up and adheres to the sand. The debris is unsightly. Because the Corps of Engineers ("Corps") is committed to maintaining Sea Gate beach by supplying sand to compensate for the natural erosion taking place, there is reason to expect sand deposition on the property to continue.

To mitigate the impact, the Corps and the City of New York have made some efforts to remove the sand behind the homes on Oceanview Drive. In 1999, the Corps anticipated removing 20,000 cubic yards from the sand accumulating on Gravesend Bay and moving it to Sea Gate beach. The plan was to use land-based equipment. Mr. Stanley Nuremburg, a Corps real estate specialist, testified that, because a small number of the Oceanview Avenue residents owned the seaward lots (including the plaintiffs), the Corps attempted to obtain their permission for access. Plaintiffs and at least one other owner refused permission. Because of the delay this precipitated, and the need to re-nourish Sea Gate beach before the summer recreational season, the effort was abandoned. The City of New York, however, performed a similar operation in 2000, although it removed less sand than had been planned by the Corps. Irrespective of which plan the Corps followed, no proposed operation would have restored the property to its pre-taking condition. Moreover, any operation would have had to be repeated periodically to prevent the accumulation of sand. Such an op-

eration might have accomplished a reduction in the volume of sand blowing across plaintiffs' bulkhead and into their backyard and house.

Plaintiffs and other residents of Oceanview Avenue also attempted sand removal. Plaintiffs have paid to have sand removed at least once from their backyard. On other occasions, Mr. Vaizburd himself has shoveled sand away from behind the top of the bulkhead. This is a task that has to be repeated several times a year, particularly in the winter. Michael Bresloff, who at the time of trial was President of the Sea Gate Community Association and lived near the Vaizburds, testified that he pays every year to have sand removed to maintain the level well below his bulkhead. This expenditure, in effect, has become a cost to Bresloff to live where he does. Apparently, some of the other owners along Oceanview Avenue have also paid to have sand removed on occasion.

In October 2000, the Corps undertook a second effort to re-nourish Sea Gate beach, and coincidentally, to protect Gravesend Bay from further sand deposition. It was an ocean-based operation involving the removal of 100,000 cubic yards of sand from the waters immediately adjacent to Norton Point and the deposition of the sand on the beach at Sea Gate. The project created a trough or depression off Norton Point, which hopefully will intercept most of the sand eroding from Sea Gate beach. Mr. Joseph Vietri explained that the only long term solution to the Gravesend problem will be implementation of the Corps' current plan to construct a series of "T-groins" on Sea Gate beach. The project has received Congressional approval, but as of the date of trial it has not been funded. Whether the T-groins are ultimately built, however, the Corps is committed to maintain Sea Gate beach at its pre–1995 levels.

Sand accumulation is also a problem on Lot 3, where the home is located. Plaintiffs, like most of their neighbors, have improvised various means to keep sand from getting into their backyards and homes. For example, plaintiffs have erected a glass extension to the bulkhead dividing Lot 3 from Lot 103. Unfortunately, this merely means that the sand has farther to go before it inevitably reaches the top, after which it blows into the backyard of plaintiffs' home, into the gutters and into the street beyond. At the time of the court's second visit to the site, the entire backyard was covered in sand. In some places, the sand was up to three feet deep.

Plaintiffs allege that sand blowing from the beach infiltrates their backyard, impedes the function of gutters and windows, and, but for periodic removal, blocks portions of the downstairs doors and windows. The court observed that there was a substantial amount of sand visible in plaintiffs' gutters and there was sand in the tracks of the doors and windows. Plaintiffs were thus burdened with the continuing presence of large quantities of sand on both Lot 3 and Lot 103.

## DISCUSSION

Because the plaintiffs were acting pro se at the time, we considered in our earlier opinion whether there was evidence of "cost of cure" which might lead to an alternative measure of recovery. We found, however, that there was "not sufficient evidence from which to fashion a remedy from the costs related to sand removal ...." 57 Fed.Cl. at 233 n. 9. We assumed that the burden of a re-occurring need for mediation had to be reflected in market data. In that respect, we were in error. As the majority concluded in its remand order, the "cost of cure" approach to recovery in a takings case is an alternative to computing damages through diminished market value. *See* 384 F.3d at 1285 n. 8. Rather, in view of the then-recently decided *Ridge Line, Inc. v. United States*, it is sufficient to measure costs associated with mediating or preventing the injury. 346 F.3d 1346 (Fed.Cir.2003).

Although we did not have the benefit of *Ridge Line* at the time of the earlier trial opinion, we held previously that "[w]e do not have sufficient evidence from which to fashion a remedy from the costs related to sand removal ...." 57 Fed.Cl. at 233 n. 9. In view of our applying the incorrect legal standard, however, and, in any event, in view of the remand order, we view the issue de novo, albeit from the standpoint of the existing record.

Plaintiffs have reviewed the record and conclude that it reflects evidence of $590,656 in damages, plus compound interest for ten years, "for the cost of erecting a protective see-through wall, repair of damages to their

house and yard, and recurrent sand removal." Plaintiffs' Supplemental Post-trial Brief on Damages ("Pls.Br.") at 1. Defendant reviews the same record and concludes that it supports, at most, $32,258.50, plus interest. Even a generous view of the record, we believe, demonstrates that defendant is closer to the mark.

*The Protective Wall*

Plaintiffs seek $18,619 for construction of a see-through wall atop the bulkhead separating Lot 3 from Lot 103. The court has seen the wall twice and it appears in a number of photographic exhibits. The wall is forty feet long and the court estimates that from the base to the top it is approximately eight feet high. The only evidence of the cost of construction is an estimate attached to the expert report of the government's appraiser, Mr. Dominick Neglia. The estimate is unsigned and undated. The name of the company offering the estimate is illegible. It is not clear why the estimate is attached to Neglia's report, except perhaps to generally support the appraiser's valuation, which included his assessment that "the subject property has suffered increased maintenance costs ... caused by the Project." Neglia's report at 132. We are far from persuaded that the fence which was the subject of the estimate was actually built. The estimate is for a fence made of two twenty foot sections of ½ inch thick anodized aluminum. The fence visible to the court was made of wood, although, like the subject of the estimate, it was topped by plexiglass.

But for the appraiser's reliance on the estimate, we would say there is no reliable evidence of cost in connection with the fence. We accept the estimate, however, because there is no question that a need existed for a substantial fence. Mr. Neglia was satisfied with the estimate, as are we.

*Landscaping and Sand Removal from Home and Yard (Lot 3)*

Even though there was testimony at trial that the Vaizburds and Mr. Bresloff paid for sand removal, there was no evidence as to how much they paid. Instead, plaintiffs rely on an estimate that Mrs. Vaizburd sought for certain remediation costs. The estimate from "TLC Landscaping" ("TLC Estimate")

is undated and unsigned. For a cost of $13,639.50, TLC apparently proposed to "remove sand from backyard by hand" dispose of debris, and "[l]andscape[,] replace top soil, sod, flowers, sprinkler system." TLC Estimate. There is no evidence that this work was done by TLC. The evidence from Mr. Vaizburd and from neighbors is that periodic efforts were made to shovel sand by hand from Lot 3 to Lot 103. From this single document, however, plaintiffs now seek to recover $13,639.50 for each of the eight years leading up to trial.

Once again, we are left with precious little evidence. Even assuming it would cost $13,639.50 to do all the work itemized on the estimate, we see no reason to assume it would all have to be repeated every year, for eight years. If indeed the sprinkler system failed and the sodding was unsuccessful, one would hardly invest in repeating the process seven times. There is no basis for distinguishing what part of the estimate relates to sand removal and what relates to the more "permanent" repairs. Moreover, if the fence atop the bulkhead—the cost of which we are allowing plaintiffs' to recover—were to serve its intended function, there would have been less sand getting into the backyard, reducing removal expenses. In short, we grant the full amount of the estimate for landscaping and sand removal from the backyard for one year, but award nothing for subsequent costs of that type. Even though we recognize that there would be a continuing need for sand removal, there is no principled basis on which to make an award for additional years.

A related element of cost is a claimed $4,800 annual expense for "removal, cleaning, and replacement of the plaintiffs' sliding glass doors and cleaning of the gutters." Pls. Br. at 9. The estimate to support that element of damages, once again appearing only as part of Mr. Neglia's appraisal, does not in fact refer to replacement of the doors, only their maintenance. As with the other estimates, this one is unsigned, undated, and we have no separate proof that the costs were actually incurred. From our site visits, however, it was apparent that such maintenance would be needed. There was sand in the gutters and there was a great deal of

sand in the sliding glass door tracks. It is readily foreseeable that sand would abrade the rollers of the sliding doors. Some of the work items estimated included more than simple cleaning and lubrication, such as replacing the door rollers and the gutter support brackets. Because of the lack of first hand evidence, however, we do not know how often those steps would have to be repeated. Accordingly, we award only the one time cost of $4,800. The balance of the claim fails for lack of proof.

*Remediation of Lot 103*

There are two cost items associated with Lot 103, the seaward lot, once completely submerged and now inundated with sand. The first has to do with debris removal. The court's visits confirmed that the accumulation of debris is a problem on Lot 103. For the same reason that sand settles out and builds up, trash is deposited. Plaintiffs seek $40,000 as the cost over eight years for removal of this debris. They arrive at that figure by isolating part of the testimony of Michael Bresloff. He testified that the association had received one estimate for cleaning Oceanview Avenue beach at a cost of $150,000. Because the Vaizburds owned one of thirty lots on the beach, plaintiffs divided the larger number and estimate the cost of cleaning their lot at $5,000 per year.

Mr. Bresloff testified as well that the appearance of trash is a recurring problem, now that there is sand behind the houses on Oceanview Avenue. He also explained that the association paid for at least one "major cleaning," Tr. at 55, but that within a few months the trash was back. As to this item, the lack of proof that plaintiffs actually incurred such costs we view as fatal. Although the plaintiffs uniquely owned Lot 103 (as opposed to their neighbors, who only owned to the edge of their house lots), Mr. Bresloff's evidence suggests that the association was willing to incur expenses for cleaning the beach periodically, and he drew no distinctions for cleaning the beach behind plaintiffs' house. If that was not the case, it was plaintiffs' burden to clarify the record. They failed to do so.

The same problem, and others, arise in connection with the costs plaintiffs claim for sand removal from Lot 103. In a jerry-rigged calculation, they conclude that these costs, over eight years would be $386,685. They begin by constructing a figure for the volume of sand that would have to be removed to return Lot 103 to its nautical character. Based on Mr. Vaizburd's recollection of a sixteen foot drop from the top of his bulkhead to the ocean floor, an assumed incline into deep water of twelve feet, a four hundred foot expanse of beach based on the court's visual estimate, and an undisputed forty foot lot width, the plaintiffs calculate that 8,593 cubic yards of sand would have to be removed.[1] They go on to assume that this sand would have to be removed every third year. To derive a cost figure, plaintiffs rely on a report prepared by Diane Rahoy, a Corps employee and a witness at trial. Ms. Rahoy, in describing methods and costs for replenishing Coney Island Beach, estimated $15–$20 per cubic yard in connection with "backpassing" sand from one location along the beach to another. Plaintiffs do not explain why this estimate, which relates to replenishing a beach, applies to sand removal. We note, moreover, that backpassing was only one method mentioned in the report. Offshore dredging, for example, was estimated at $8 per cubic yard.

The unreliability of the volume estimate is apparent. The fact that the cost was not incurred, moreover, should give us some hesitation, particularly when, as defendant points out, the cost of cure for sand removal alone exceeds the pre-taking value of the property. One reason this "cure" was not effected might relate to the fact that, even if it were momentarily possible to excavate a 40 foot wide channel between Mr. Vaizburd's former dock and deep water, it would not remain open for long. There are hundreds of feet of beach adjoining Lot 103. An engineer's expertise is not required to observe that sand, being unstable by nature, particularly in the presence of moving water, would naturally slough into the channel. To keep the channel open would no doubt require removing most of the beach along Oceanview

---

1. Plaintiffs' based their calculation on an average depth of 14.5 feet.

Avenue. In short, keeping Lot 103 free of sand would be an exercise in futility, and one we believe the law does not require. Such an approach to damages would compel resort to a diminished-value methodology, which has already been rejected.

*Summary of allowed costs*

We have allowed the following items of cost: $18,619 for erection of a wall atop the bulkhead, $13,639.50 as a one-time expense for landscaping and sand removal from Lot 3, and $4,800 for repairing damage to the house. Any other costs, including any recurrence of these costs, we reject for lack of proof.[2] The total amount of recovery, therefore, prior to interest, is $37,058.50.

*Interest*

■ Plaintiffs seek interest on the recovery calculated at a compound rate based upon the return on long-term corporate bonds as reported by Moody's Investor Services. Plaintiffs support their request with general references to the requirement of full compensation for loss due to delay. *See, e.g., Miller v. United States,* 223 Ct.Cl. 352, 403, 620 F.2d 812, 839 (1980) ("It is constitutionally required that plaintiffs must receive an amount sufficient to produce the full equivalent of the value paid contemporaneously with the taking."). The issue is one of fact, based on the particular circumstances of a given case. *Dynamics Corp. of America v. United States,* 766 F.2d 518, 520 (Fed.Cir. 1985).

Here, there was no presentation directed at the appropriate interest rate, or whether it should be compounded. Defendant therefore urges the court to use the statutory interest rate set out in the Declaration of Taking Act, 40 U.S.C. §§ 3114–3116, 3118 (2000). That act specifies the use of "the weekly average one-year constant maturity Treasury yield ...." *Id.* § 3116. Defendant does not take a position in its briefing on whether compounding is appropriate, although some of the case law it cites to support its argument for the use of the statutory interest rate does incorporate compounding. *See, e.g., NRG Co. v.*

*United States,* 31 Fed.Cl. 659, 670 (1994); *Century Wrecker Corp. v. E.R. Buske Mfg. Co., Inc.,* 913 F.Supp. 1256, 1283 (N.D.Iowa 1996); *see also Dynamics Corp.,* 766 F.2d at 520.

In the absence of special proof that a rate other than that approved for use in statutory condemnations is appropriate, we use that rate. Compounding we view as a routine means by which a reasonable person would protect themselves, over an extended period of time, from erosion of their investment. Hence, we allow compounding.

## CONCLUSION

Our prior judgment is vacated. Our prior findings are re-adopted, however, with the exception of the rejection of a "cost of cure" recovery. The United States is liable to plaintiffs for taking an easement on their property for the deposition of sand. Compensation has been established only with respect to the cost of cure. Based on our findings above, plaintiffs have established entitlement to $37,058.50, plus compound interest pursuant to 40 U.S.C. § 3116, from December 31, 1995, the date of taking, to the date of payment. The Clerk is directed to enter judgment accordingly. Costs to plaintiffs.

---

**2.** During oral argument, the court inquired as to the reason for capping the claim for recurring costs at eight years. We were informed by counsel that plaintiffs had sold their property during litigation. In view of the remand direction to limit consideration of the cost of cure theory of damages to the record existing after trial, we do not take this representation into account.