**OTAY MESA PROPERTY L.P. et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 06–167L.**

United States Court of Federal Claims.

June 30, 2010.

Roger J. Marzulla, with whom was Nancie G. Marzulla, Marzulla Law, LLC, Washington, D.C., for Plaintiffs.

Lary Cook Larson, with whom were Ignacia S. Moreno, Assistant Attorney General, and Joshua Doan, Trial Attorney, United States Department of Justice, Natural Resources Section, Environment & Natural Resources Division, Washington, D.C., Melissa Erny and A. Ted Kundrat, United States Customs and Border Protection, Of Counsel, for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

This Fifth Amendment taking case is in the damages phase to determine the just compensation owed to Plaintiffs Otay Mesa Property, LP, Rancho Vista Del Mar, Otay International, LLC, OMC Property, LLC, D & D Landholdings, LP, and International Industrial Park. These Plaintiffs, all affiliated with the Roque De La Fuente II family, own eleven contiguous parcels of largely undeveloped land in San Diego County, California, near the Mexican border. The just compensation claim arises from the activities of the United States Border Patrol on Plaintiffs' property. Previously, the Court found Defendant liable for taking an easement on five of Plaintiffs' parcels by installing and using seismic sensors to detect entrants crossing the border into the United States. *Otay Mesa Prop. L.P. v. United States*, 86 Fed.Cl. 774, 790–91 (2009).

In the liability decision, the Court ruled that many of the Border Patrol activities on Plaintiffs' property were barred by the six-year statute of limitations in 28 U.S.C. § 2501 (2006). *Otay Mesa*, 86 Fed.Cl. at 786–90. However, prior to the liability trial in 2008, Defendant filed a "stipulation" of partial liability for the placement of seismic sensors on parcels 1, 3, 4, 5, and 10.[1] (Def.'s

Stipulation ("Stip."), Aug. 28, 2008, amended Oct. 16, 2008.) These sensors are buried below the ground except for an eighteen-inch antenna, and thus the Border Patrol's use of them was not "open and notorious" on Plaintiffs' property. *See Ingrum v. United States*, 560 F.3d 1311, 1317 (Fed.Cir.2009) (imputing to the landowner knowledge of all open and notorious activities on his property). Agreeing with Defendant's admission of liability in the "stipulation," the Court ruled that Plaintiffs' takings claims concerning the seismic sensor easement were not barred by the statute of limitations. *Otay Mesa*, 86 Fed.Cl. at 791.

The parties have polar opposite positions on the amount that Plaintiffs should receive in just compensation. Plaintiffs claim $23,592,400, plus interest, for the five parcels and time periods stated in the stipulation, and for other parcels and time periods not contained in the stipulation. Plaintiffs base their claim principally on the testimony of Border Patrol Agent Michael Hance, who recalled that only one of the eleven parcels (parcel 8) never had sensors placed on it. (Hance, Tr. 412–13.) Plaintiffs have employed a fair market value approach through expert testimony, using comparable real estate transactions in the vicinity of Otay Mesa as the basis for their claim. Conversely, Defendant would award nominal damages of $100 per parcel for each of the five parcels identified in the stipulation, based upon a "before and after" valuation method. Defendant maintains that the sensors have had no effect on the value of Plaintiffs' property.

The Court conducted a trial on damages in Washington, D.C. during November 17–19, 2009. Thereafter, the parties submitted post-trial briefs on February 22, 2010 and reply briefs on March 22, 2010. The Court heard closing arguments on April 26, 2010.

In brief summary, the Court finds that Plaintiffs are entitled to just compensation of $3,043,051, plus interest. The Court bases this conclusion on a finding that the Border

---

1. Defendant's "stipulation" was a unilateral concession of liability. Plaintiffs did not participate in the drafting or review of this document, and thus did not agree to its substance. Any uncertainty as to the scope or meaning of Defendant's "stipulation" must be ascribed solely to Defendant.

Patrol possesses a temporary, non-exclusive, blanket easement to deploy seismic sensors on parcels 1, 3, 4, 5, and 10. The easement is "temporary" because either party may terminate it, through a determination that the sensor no longer is needed, or through Plaintiffs' election to develop the property. (Def.'s Stip. ¶ 7.) The easement is "non-exclusive" because the use of the sensors places no restriction on the functionality of the property to Plaintiffs. The easement is a "blanket" transaction on each of the five parcels, because the Border Patrol may change the location of any sensor whenever it desires, and its agents must have the ability to access the sensors at any time.

The Court's assessment of just compensation is based upon a rental rate of $41.50 per acre per month. The rate of $41.50 is the average of two non-exclusive easement transactions ($25 per month, $58 per month) that the Court finds most comparable to the Border Patrol's sensor easements. These transactions are for skydiving and parachute training easements in the vicinity of Plaintiffs' property. Using the installation dates and parcel numbers provided in Defendant's stipulation, the Court has calculated an amount for each of the five parcels through October 2008 by multiplying $41.50 per month by the number of acres in each parcel. The October 2008 end date of the calculation reflects the date selected by Plaintiffs in presenting their damages evidence. The Court will allow interest on Plaintiffs' award from the sensor installation date on each parcel through October 2008.

### Findings of Fact

The relevant background facts are described in detail in the Court's 2009 liability decision. *Otay Mesa*, 86 Fed.Cl. at 778–85. The additional facts below relate to Defendant's stipulation of liability regarding the sensor easement, the Border Patrol's activities on Plaintiffs' property relating to the sensors, and the biological resources on Plaintiffs' property. The biological resources are relevant to the ways in which Plaintiffs might develop the property in the future.

### A. *Defendant's 2008 Stipulation of Partial Liability*

In its stipulation of liability, the Government admitted to the installation of fourteen sensors on parcels 1, 3, 4, 5, and 10 of Plaintiffs' property. These five parcels consist of approximately 897 acres. (Tagg, Tr. 694.) The owners of these parcels are as follows: Otay Mesa Property, LP owns parcel 1, which consists of 89 acres. (Tagg, Tr. 681–82.)[2] Rancho Vista Del Mar owns parcel 3, which consists of 393.6 acres, and parcel 5 which consists of 120 acres. *Otay Mesa*, 86 Fed.Cl. at 778. Otay International, LLC owns parcel 4, which consists of 160 acres. *Id.* D & D Landholdings, LP owns parcel 10, which consists of 134.89 acres. *Id.*

The Border Patrol lacks records of the precise sensor locations, so Defendant provided in its stipulation only the approximate locations for the fourteen sensors it placed on the five parcels of Plaintiffs' property. (Def.'s Stip. ¶ 5; DX 115.) As of the November 2009 damages trial, only eleven sensors remained on Plaintiffs' property. (Herrera, Tr. 828–30; DX 115A.) Therefore, after Defendant filed its stipulation of liability in August 2008, the Border Patrol removed three sensors from the five parcels and did not replace or re-install them elsewhere on Plaintiffs' property. (Herrera, Tr. 826–27.) The Border Patrol explained that it removed these sensors because illegal aliens no longer were crossing in the area where the sensors were deployed. *Id.* However, the record does not indicate which sensors were removed, or on what date they were removed.

The substance of Defendant's concession of liability in the stipulation is highly relevant to the resolution of this case. The Court, therefore, will review the contents of the stipulation in some detail. The first paragraph describes the five parcels of Plaintiffs' land upon which the Border Patrol admits to placing fourteen sensors. (Def.'s Stip. ¶ 1.) In paragraphs 2 through 5, Defendant identifies the Border Patrol's authority under 8 U.S.C.

---

**2.** In his testimony during the damages trial, Plaintiffs' expert, Mr. Randy Tagg, explained that parcel 1 consists of 89 acres, not the 74.55 acres to which the parties had stipulated prior to the liability trial. *See Otay Mesa*, 86 Fed.Cl. at 778. The Court accepts Mr. Tagg's correction.

§ 1357(a)(3) [3] to place the sensors on Plaintiffs' property, the physical dimensions and characteristics of each sensor, and the installation date of each sensor on a particular parcel. *Id.* at ¶¶ 2–5. The Border Patrol installed the first sensor on parcel 3 in April 1999, and the last sensor on parcel 1 in November 2005. *Id.* at ¶ 5. Included below is the chart from Defendant's stipulation, which lists the installation date and parcel for all fourteen sensors:

| Sensor Numerical Designation | Date Installed | Location |
| --- | --- | --- |
| 606–1 | September 2004 | Parcel 3 |
| 607–1 | September 2005 | Parcel 4 |
| 609–1 | November 2005 | Parcel 1 |
| 610–1 | August 2004 | Parcel 4 |
| 611–1 | August 2003 | on border between Parcels 4 & 1 |
| 611–2 | July 2005 | Parcel 4 |
| 628–1 | September 2004 | Parcel 1 |
| 629–1 | September 2004 | Parcel 1 |
| 630–1 | April 1999 | Parcel 3 |
| 631–1 | August 2003 | Parcel 1 |
| 606–2 | October 2004 | Parcel 5 |
| 607–2 | September 2005 | Parcel 5 |
| 603–1 | September 2004 | Parcel 10 |
| 603–2 | September 2004 | Parcel 10 |

*Id.*

Paragraph 6 of the stipulation contains Defendant's concession of liability for the taking of an easement on Plaintiffs' property. *Id.* at ¶ 6. It states:

> ... Defendant hereby stipulates that, by virtue of its placement of the 14 sensors specified above [in paragraph 5] on the listed parcels of land, it has taken a property interest in the nature of an easement over the parcel of land on which the sensors have been placed[.]

*Id.* Paragraph 6 further details that this concession is applicable only to parcels 1, 3, 4, 5, and 10 for the purpose of this litigation. *Id.* Paragraph 7 describes the Government's

property interests in the five parcels as follows:

> A perpetual and assignable easement to locate, construct, operate, maintain and repair or replace the specified underground seismic intrusion sensors on the specified parcels, including the right to ingress and egress to each sensor location.

*Id.* at ¶ 7. Defendant defines the scope of its easement on the five parcels to "have commenced on the date the sensor is listed as having been installed" and to "continue until the sensor is no longer needed or the property is developed." *Id.* Removal of a sensor would terminate any portion of the easement relating to that sensor. *Id.*

Further, the stipulation seeks to minimize the impact of the claimed easement on the future development of the affected parcels by specifying:

> Each sensor is and shall be located so as to not affect the functionality of the property. Should the landowner desire to develop any portion of the subject parcel, the sensor will be removed or redeployed upon 30 days written notice that a grading permit has been issued by the County of San Diego permitting development of all or a portion of the property.

*Id.* at ¶ 7. The Border Patrol's easement as defined by its stipulation also is subject to any existing easements for public roads, highways, public utilities, railroads and pipelines. *Id.* The "easement reserves to the landowner, his heirs, executors, administrators, successors and assigns such rights and privileges as may be used and enjoyed without interfering with or abridging the rights of the easement being acquired." *Id.*

### B. *Border Patrol Operations on Plaintiffs' Property*

Border Patrol operations are divided into sectors. (Joint Stipulation ("Stip.") ¶ 45, August 28, 2008.) Relevant to the property at issue in this case is the San Diego Sector Office of the Border Patrol. Id. The San Diego Sector Office has responsibility over a

---

**3.** 8 U.S.C. § 1357(a)(3) authorizes the Border Patrol "within a distance of twenty-five miles from any such external boundary [of the United States] to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States."

number of Border Patrol stations that respond to sensor activations or "hits" on Plaintiffs' property, including the Chula Vista station and the Brown Field station. (See Joint Stip. ¶ 46.)

The Border Patrol uses two models of seismic intrusion sensors on Plaintiffs' property. The first model measures approximately 10 inches wide by 12 inches long and 5 inches deep, and the second model measures approximately 12 inches wide by 14 inches long and 6 inches deep. (Herrera, Tr. 809–11.) To install a sensor, agents use a shovel to dig a hole slightly larger than the sensor and place the dirt removed on a tarp so that it can be used again to bury the sensor once placed. (Herrera, Tr. 821–22; DX 121.) Usually a geophone, which is attached to the sensor by a cable, is arranged directly underneath the sensor in the hole to detect the vibrations of passers-by. (Herrera, Tr. 853–56.) Once the sensor is buried in the ground, an antenna approximately eighteen inches in length extends above the ground from the sensor and often is camouflaged into the landscape by the placement of dry grass stems over it. (Herrera, Tr. 810, 823–24; DX 112, 121, 122.) The antenna is used to transmit a signal to a Border Patrol dispatcher upon detection of activity around the sensor.

The sensors are installed in a manner which makes them virtually impossible to detect. (Herrera, Tr. 823; see DX 121.) Two agents explained at the damages trial that the Border Patrol attempts to place sensors in locations along the United States–Mexico border where they will provide the best tactical advantage for Border Patrol operations. (Hance, Tr. 448; Herrera, Tr. 815–16.) According to the agents, illegal aliens crossing from Mexico into the United States typically take advantage of the natural terrain, using the low-lying areas and draws for cover to remain hidden from Border Patrol agents stationed in higher positions. (Hance, Tr. 438; Herrera, Tr. 816.) Illegal aliens have created trails through many of these areas along the border. (Hance, Tr. 438–39; Herrera 816.) Consequently, the Border Patrol typically places sensors near these trails. (Hance, Tr. 447–48; Herrera, 815–17.) The sensor's range is dependent on the terrain in which it is placed, but generally the device can detect an illegal alien from up to 30 feet away. (Herrera, Tr. 825.) Border Patrol agents occasionally move the sensors to new trails created by illegal aliens to ensure their continued effectiveness. (Hance, Tr. 449–50; Herrera, Tr. 840–41.) Only infrequent maintenance needs to be performed on the sensors, primarily to change a battery, which lasts from six months to two years. (Herrera, Tr. 814.) During the liability trial, Border Patrol agents confirmed the central role these sensors play in the apprehension of illegal aliens. (See, e.g., Weatherred, Tr. 1506 (asserting 85 percent of apprehensions are attributable to sensors).) Other activities, however, such as earthquakes, tremors, wildlife, vehicles, airplanes, and helicopters can cause the sensors to transmit false signals. (Herrera, Tr. 814–15.)

When a sensor is activated, it transmits a radio signal to a Border Patrol dispatcher. (Hance, Tr. 417–18.) After receiving a signal, the dispatcher sends a message on a radio frequency to the Border Patrol station closest to the activated sensor, and agents are deployed to intercept the detected illegal alien. Id. Agents do not respond to the location of an activated sensor, but instead, rely on information provided by the sensor to track the movement of the illegal aliens and determine how best to intercept them. (Hance, Tr. 418, 454–57.) Often, in performing their duties, Border Patrol agents drive all-terrain vehicles and sport utility vehicles on and off roads on Plaintiffs' property. (Joint Stip. ¶ 38.) Agents generally travel on existing roads to reach the most tactically advantageous places to intercept illegal aliens. Occasionally, off road excursions can result in accidents or a flat tire and delay apprehension. (Hance, Tr. 457–58.) When pursuing aliens on foot, the use of established trails, free of rocks, holes, and brush, generally is the fastest and safest method for agents to apprehend the aliens. Id. at 458. Notably, four of the parcels upon which Defendant admits to placing sensors in its stipulation (parcels 3, 4, 5, and 10) can be accessed only by traversing other property owned by Plaintiffs. (See DX 111.)

Regardless of whether there is any activity in the area of a sensor, the sensor is set to "check in" with a dispatcher every 24 hours to indicate that it still is functioning. (Herrera, Tr. 842.) If a sensor does not "check in" for three to five days, or if it otherwise has not been activated, Border Patrol agents will enter Plaintiffs' property to examine the sensor. *Id.*

In addition to sensors, the Border Patrol uses night scopes and helicopter over-flights to detect and track illegal aliens across Plaintiffs' property. (Hance, Tr. 459–60.) Fewer illegal aliens today, however, cross the border on to Plaintiffs' property than in the 1990s. (Hance, Tr. 455–56, 924–25.) As a result, there are fewer Border Patrol agents on Plaintiffs' property today than there were from 1996 to 2000. (Hance, Tr. 925–26.)

Border Patrol agents testified that, since sensors are a valuable asset to the Border Patrol's operations and are not effective in developed areas, the Border Patrol will move or remove a sensor if Plaintiffs begin grading or construction on their property. (Hance, Tr. 450–51, 927; Herrera, Tr. 807–08.) The Border Patrol does not reinstall sensors in developed areas that have been graded flat or improved with construction. (Herrera, Tr. 838–39.) A new port of entry and access road is planned to be built on or near the western edge of parcel 1. (Tagg, Tr. 766; DX 62 at 18.) The Border Patrol anticipates removing sensors from Plaintiffs' property when construction on the new port of entry and road begins. (Hance, Tr. 926–27.)

Since the conclusion of the liability trial in October 2008, Plaintiffs have obtained permits to grade portions of parcels 7, 8, 9, and 11. (Wick, Tr. 359–60.) The Border Patrol continues to pursue illegal aliens across these newly graded parcels. (Hance, Tr. 463–65, 466–67; Novik, Tr. 480–81.)

C. *Biological Resources on Plaintiffs' Property*

The U.S. Fish and Wildlife Service has determined that many endangered and threatened species and their respective critical habitats are found on parcels 1, 3, 4, 5 and 10 of Plaintiffs' property, including: San Diego fairy shrimp, Riverside fairy shrimp, California gnatcatcher, quino checkerspot butterfly, and the Otay tarplant. (Wynn, Tr. 868–83; DX 66.) A "critical habitat" is defined as property that is both within a designated boundary and supports the primary constituent elements essential for the survival of a specific species. (Wynn, Tr. 872–74, 888–901.) Areas within a designated boundary that do not have any of a species' primary constituent elements are not critical habitats. *Id.* Parts of the Plaintiffs' property also are important to the California Department of Fish and Game for conservation purposes, in particular because the property abuts already preserved land. (Lawhead, Tr. 556–58.) If impacted, portions of Plaintiffs' property, such as the Coastal sage scrub habitats, the chaparral and non-native grassland and the vernal pool habitats, would require mitigation. *Id.*

The Border Patrol typically does not install sensors in areas where there are fixed biological resources, such as vernal pools, the habitat of the San Diego fairy shrimp, or flat areas, the habitat of the quino checkerspot butterfly, primarily because these areas are not desirable sensor locations. (See Herrera, 817; Wynn, 887–90; Lawhead, Tr. 552–53; DX 67, 124.) The water of vernal pools can cause the sensors to malfunction and the flatter areas of the quino checkerspot butterfly's habitat generally are avoided by illegal aliens. *Id.* The Border Patrol asserts that it places sensors in a manner to minimize disruption to the surrounding environment, in part because the Border Patrol does not want to reveal any environmental indication to illegal aliens of the location of the sensors. (Herrera, Tr. 821–24; Wynn, Tr. 887–89.)

Plaintiffs have offered portions of the property at issue in this litigation as mitigation to off-set development on similar habitats in the surrounding Otay Mesa area. When a habitat is preserved for its mitigation value, the local, state and federal wildlife agencies work to insure that the area is not subjected to unnecessary disturbances and that it can be maintained in its present condition, or better, in perpetuity. (DX 67 at 4.) Typically, wildlife agencies will permit small intrusions in the mitigation areas with no penalties. *See id.* However, the agencies

give no mitigation credit if there is a significant intrusion into the designated area. *Id.*

In 2003, Plaintiffs set aside 120 acres on parcel 3 as a pre-approved mitigation area for coastal sage. (Carter, Tr. 203–04, 209–12; DX 26, 27.) The California Department of Fish and Game and the U.S. Wildlife Service reviewed the area and approved of its use as mitigation for other impacted yet comparable coastal sage habitats. (Carter, Tr. 204.) Plaintiffs later sold 15 acres of mitigation credits from the 120 available acres. (Carter, Tr. 204; DX 70.) Although Plaintiffs intended to sell additional credits from the 120 acres reserved for mitigation purposes, most of it still is available for sale. (Carter, Tr. 206–07.) The Border Patrol admits to installing sensors in the draws of parcel 3 sometime before 2003. (Hance, Tr. 460.)

Plaintiffs also were able to set up a similar mitigation land bank in O'Neill Canyon, another property owned by Plaintiffs north of parcel 11 where the Government admits to placing at least two sensors between1992 and the present. (Hance, Tr. 467–68; Carter, Tr. 186, 205.) Despite Border Patrol activity in this area, Plaintiffs sold all mitigation credits available in O'Neill Canyon. (Hance, Tr. 467; Carter, Tr. 187.)

### Discussion

### A. *Just Compensation Award for Fifth Amendment Taking*

The Tucker Act grants to this Court exclusive jurisdiction over Fifth Amendment takings claims brought against the United States for amounts greater than $10,000. *Morris v. United States,* 392 F.3d 1372, 1375 (Fed.Cir.2004) (citation omitted). The Fifth Amendment provides in relevant part "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. Thus, when government action results in a taking of private property rights, the Constitution requires compensation. *See, e.g., First Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 314–15, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987); *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). "The Fifth Amendment's guarantee that private property shall not be taken for public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong,* 364 U.S. at 49, 80 S.Ct. 1563.

There are two types of compensable takings under the Fifth Amendment: (1) physical takings caused by the Government's physical invasion or appropriation of private property, or (2) regulatory takings resulting from government regulations that unduly burden private property interests. *See Yee v. City of Escondido,* 503 U.S. 519, 522–23, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992); *Huntleigh USA Corp. v. United States,* 525 F.3d 1370, 1378 (Fed.Cir.2008). Significantly, not every government invasion is a taking. *See, e.g., PruneYard Shopping Ctr. v. Robins,* 447 U.S. 74, 82, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *Kaiser Aetna v. United States,* 444 U.S. 164, 174, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). In the present case, Defendant has admitted, and the Court has agreed, that the Border Patrol's actions constitute a physical taking of Plaintiffs' property. *See* Def.'s Stip. ¶ 6; *Otay Mesa,* 86 Fed. Cl at 775–76.

The Supreme Court has defined just compensation as "the full and perfect equivalent in money of the property taken. The owner is to be put in as good [a] position pecuniarily as he would have occupied if his property had not been taken." *United States v. Miller,* 317 U.S. 369, 373, 63 S.Ct. 276, 87 L.Ed. 336 (1943); *see also Monongahela Navigation Co. v. United States,* 148 U.S. 312, 326, 13 S.Ct. 622, 37 L.Ed. 463 (1893) ("There can … be no doubt that the compensation must be a full and perfect equivalent for the property taken"); *Narramore v. United States,* 960 F.2d 1048, 1051 (Fed.Cir.1992) ("The Fifth Amendment guarantees a property owner the right to seek damages for the full extent of a taking.") (citation omitted). There is no specific formula or "definite standards of fairness by which the measure of 'just compensation' is to be determined." *United States v. Cors,*

337 U.S. 325, 332, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949).

■ To determine the appropriate valuation method for calculating a just compensation award, the Court first must ascertain whether the Government's activity denies a landowner permanent or temporary use of his property. In the case of a permanent government taking of private property, the proper measure of just compensation is generally "the fair market value of [the] property at the time of the taking." *Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 474, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973) (citing *New York v. Sage,* 239 U.S. 57, 61, 36 S.Ct. 25, 60 L.Ed. 143 (1915)).

■ A temporary taking typically denies a landowner all use of his property only for a finite period and so the just compensation to which the owner is entitled is the fair market rental value for the use of the property during the time of the taking. *See, e.g., Yuba Natural Res., Inc. v. United States,* 904 F.2d 1577, 1580–81 (Fed.Cir.1990); *Kimball Laundry Co. v. United States,* 338 U.S. 1, 7, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949) ("[T]he proper measure of compensation [in a temporary takings case] is the rental that probably could have been obtained . . . ."); *First Evangelical,* 482 U.S. at 315, 107 S.Ct. 2378 ("Where this burden results from governmental action that amounted to a [temporary] taking, the Just Compensation Clause of the Fifth Amendment requires that the government pay the landowner for the value of the use of the land during this period."); *United States v. Gen. Motors Corp.,* 323 U.S. 373, 382, 65 S.Ct. 357, 89 L.Ed. 311 (1945). The fair market rental value of the occupied property should be calculated as the price that a willing, hypothetical lessee would pay to a willing, hypothetical lessor for the period of the taking. See *Kimball Laundry Co.,* 338 U.S. at 7, 69 S.Ct. 1434; *Yuba Natural Res., Inc.,* 904 F.2d at 1581; *Yaist v. United States,* 17 Cl.Ct. 246, 257 (1989). The Supreme Court explicitly rejected in *Kimball Laundry* the measuring of just compensation for a temporary taking by "the difference between the market value of the fee on the date of the taking and its market value on

the date of its return." 338 U.S. at 7, 69 S.Ct. 1434.

■ An award of just compensation cannot include consequential damages suffered by the landowner as a result of the taking. See *Gen. Motors,* 323 U.S. at 380, 65 S.Ct. 357 ("[T]hat which is taken or damaged is the group of rights which the so-called owner exercises in his dominion of the physical thing, and that damage to those rights of ownership does not include losses to his business or other consequential damage."); *Heydt v. United States,* 38 Fed.Cl. 286, 306 (1997).

**B. Scope of Defendant's Stipulated Easement Over Plaintiffs' Property**

The Court cannot determine just compensation in this case without first identifying the precise scope of the easement Defendant admitted to taking in its stipulation. *See Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 437, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) ("Once the fact of occupation is shown, of course, a court should consider the extent of the occupation as one relevant factor in determining the compensation due.").

**1. The Government Has Taken a Blanket Easement Over Five Parcels.**

Plaintiffs argue that the Government concedes in its stipulation to the taking of a "blanket" easement over the entire five parcels (897 acres) for the placement of its sensors. In contrast, the Government maintains that its concession of liability constitutes only a physical occupation of approximately fourteen square feet—one square foot per sensor unit—with the right to ingress and egress to each sensor location. The Government argues that the scope of its taking is similar to *Loretto,* 458 U.S. at 438 n. 16, 102 S.Ct. 3164, where the State of New York authorized the installation of approximately one-and-one-half cubic feet of cable television equipment on a five-story building. (Def.'s Post–Trial Br. 32.)

■ The Government's assertion of liability for the taking of fourteen separate easements, each one square foot, is unsupported

by the language of its stipulation and the testimony of its expert witness. The stipulation defines the Government's easement as including the right to "locate" the sensors on the five parcels of Plaintiffs' property. (Def.'s Stip. ¶ 7.) This language suggests that the Border Patrol may place its fourteen sensors anywhere on the five parcels and move them to different locations as desired. The Government's declared "right to ingress and egress to each sensor location" in its stipulation similarly is unrestricted. *Id.* The language of the stipulation thus places no limits on the Border Patrol's placement of its sensors on the five parcels, the movement of the sensors to other locations, or the manner in which the sensors are accessed. Moreover, the Government's expert, Robert Lea, concedes that the easement specified in the Government's stipulation covers the entirety of five parcels of Plaintiffs' property. (Lea, Tr. 968 ("[T]o the extent that the specific locations of the sensors cannot be determined . . . it's a floating easement.").) The Government is bound by the language of its stipulation. Accordingly, the Court concludes that Plaintiffs are entitled to just compensation for a "blanket" easement taken by the Government over the entirety of parcels 1, 3, 4, 5, and 10.

2. *The Government's Easement is For The Placement of Fourteen Sensors From April 1999 to October 2008.*

■ Plaintiffs contend that they are entitled to just compensation for the Government's taking of an easement on Plaintiffs' property for additional years beyond those specified in the Government's stipulation. The Government has conceded liability only for the placement of sensors on Plaintiffs' property from the date a sensor is first installed to the date a sensor is removed. For the years covered by the stipulation, Plaintiffs have proposed that the Court calculate the value of the Government's easement over the entirety of the five parcels for the period of August 1999 to October 2008. However, the Court finds the proper calculation to be from the date that a sensor first was install-

ed on each parcel up to October 2008, so that the valuation is performed on a parcel-by-parcel basis.

In addition, based on the testimony of a Border Patrol agent during the damages trial that sensors were placed on the five parcels specified in the stipulation as early as 1984, Plaintiffs ask the Court to award damages for an additional fifteen years, from 1984 to 1999. Although Agent Michael Hance vaguely recalled that sensors first were placed on Plaintiffs' property in 1984 (Hance, Tr. 412–13), it is difficult to corroborate his testimony. Prior to 2007, the Border Patrol did not maintain any official records of sensor locations. (Good, Tr. 793–94.) Since 2007, the Border Patrol states that it uses GPS coordinates to keep better track of its sensors. *Id.*

Further, Plaintiffs claim that Agent Hance's testimony establishes that the Government has been placing sensors on Plaintiffs' parcels 2, 6, 7, 9, and 11 since 1984.[4] (Hance, Tr. 412–415, 435, 461.) Although this Court held in its liability decision that the Government is liable only for its admitted physical taking in its stipulation of an easement to use sensors on five of Plaintiffs' eleven parcels, Plaintiffs continue to assert that they are entitled to just compensation for the placement of sensors on ten parcels— not simply those parcels included in the Government's stipulation.

The Court rejects Plaintiffs' request to extend the Government's admission of liability to include sensors on other parcels, not included in the Government's stipulation, that were removed years ago and the placement of which cannot readily be confirmed. Moreover, in its liability opinion, the Court already declined to expand the Government's stipulation of partial liability to an admission of a physical taking of Plaintiffs' entire property. *Otay Mesa,* 86 Fed.Cl. at 776. The Court concluded that Plaintiffs were entitled only to a judgment of liability for the stipulation's seismic sensor easement and no more, noting:

the only parcel not included in Plaintiffs' just compensation claim.

---

4. According to the Border Patrol's Agent Hance, parcel 8 of Plaintiffs' property never had sensors on it. (Hance, Tr. 412–13.) Parcel 8 therefore is

While seismic sensors accounted for 85 percent of apprehensions throughout the San Diego Sector, the Border Patrol testified that agents relied primarily on night scopes to detect illegal aliens on the subject property. *Compare* Weatherred, Tr. 1505–06 with Weatherred, Tr. 1509–10. The Border Patrol's response to triggered sensors on fewer than half of the parcels does not amount to a 'permanent and exclusive occupation' of the subject property at large. *See Boise Cascade Corp. [v. United States]*, 296 F.3d [1339], 1353 [ (Fed.Cir.2002).]

*Id.* at 790–91. Despite Plaintiffs urging of the Court to reconsider its earlier ruling limiting the scope of the Government's conceded liability, the Court finds no new or contradictory evidence to warrant revisiting this issue. Accordingly, consistent with its previous liability decision, the Court only will evaluate the just compensation due Plaintiffs as a result of the Government's taking of an easement to place fourteen sensors anywhere on five parcels of Plaintiffs' property and to access the sensors.

The Court only will award compensation for the Government's taking as defined by the stipulation. The Hance testimony that Plaintiffs rely upon is too vague and imprecise to form the basis of a taking. Therefore, under the terms of the stipulation, the easement as it pertains to each of the fourteen listed sensors begins with the initial placement of each sensor. The Court thus will start Plaintiffs' damages for each sensor, beginning the calculations from the date each sensor was first placed. The Court will employ the end date provided by Plaintiffs (October 2008) to limit the scope of damages awarded for the placement of each of the fourteen sensors. Although the Court acknowledges that some sensors have been removed since trial proceedings in this case began, the Court will award Plaintiffs' compensation consistent with Defendant's stipulation. Since Defendant's stipulation admits to the placement of the fourteen sensors, Plaintiffs will receive damages for the placement of each of these sensors.

### C. *The Government's Taking of an Easement Over Five Parcels of Plaintiffs' Property is a Temporary Taking.*

■ Language in the Government's stipulation defines the Government's easement as both a permanent and a temporary taking. Obviously, the Government's taking must be one or the other.

The Government argues that its easement over Plaintiffs' property is permanent. Confusingly, the Government's stipulation defines the easement as both "perpetual" and terminable. (See Def.'s Stip. ¶ 7.) In relevant part, the Government's stipulation provides:

> Should the landowner desire to develop any portion of the subject parcel, the sensors shall be removed or redeployed upon 30 days written notice that a grading permit has been issued by the County of San Diego permitting development of all or a portion of the property. Upon removal of a sensor, the portion of the easement relating to that sensor shall terminate.

*Id.* Paragraph 7, however, also defines the easement as "a perpetual and assignable easement...." *Id.* The Government claims its easement is "perpetual" to the extent that a termination date for the easement is not specified in the stipulation. See *Id.* The Government agrees that "the easement will not last forever," but without a clear termination date, the Government maintains that its easement is permanent. (Def.'s Post–Trial Br. at 38.)

■ The Federal Circuit has acknowledged that " 'permanent' does not mean forever, or anything like it." *Hendler v. United States*, 952 F.2d 1364, 1376 (Fed.Cir.1991). However, in order for the Government's taking to be permanent, it does need to be a substantial physical occupation of Plaintiffs' property. *See id.* at 1377. This Court found in its liability decision that the Border Patrol's significant presence in the mid-to-late 1990s constituted a permanent physical taking. *See Otay Mesa*, 86 Fed.Cl. at 788. Ultimately, the Court concluded that it was barred by the Tucker Act's six-year statute of limitations from considering this permanent takings claim. *Id.* at 786–90. The Court found that Plaintiffs' other claim con-

cerning the Government's taking of an easement to place sensors on Plaintiffs' property was not time-barred. *Id.* at 791.

The Government's sensor easement is more intrusive than the cable equipment easement in *Loretto*, where the offending cable box was installed only in a single location on a private roof. *See* 458 U.S. at 422, 438 n. 16, 102 S.Ct. 3164. Most significantly, the Government's easement terminates upon the occurrence of one of two events: (1) when the sensor is removed because it is no longer needed; or (2) when Plaintiffs obtain a grading permit from the County of San Diego permitting development of all or a portion of the property. (Def.'s Stip. ¶ 7.) Even though these potential termination dates are not fixed, they still serve to make the sensor easement temporary, and not permanent. The easement will end with certainty upon the occurrence of either one of the described termination events.

### D. Plaintiffs Are Owed The Fair Market Rental Value of The Government's Easement.

■■■ Having determined the scope of the Government's temporary sensor easement, the Court must assess the value of this easement. "The constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness ... as it does from technical concepts of property law." *United States v. Fuller*, 409 U.S. 488, 490, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973) (internal citations omitted). An award of just compensation should put Plaintiffs in no better position than if they had sold the easement to a private buyer. *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934). Similarly, Plaintiffs' position should be no worse as a result of the Government's taking. *Id.*

Each of the parties offered the court a different method by which to value the Government's easement. The Government proposes that the Court employ the "before-and-after" method often utilized in cases of a partial taking involving an easement where the entire parcel is valued before and after the easement was imposed. See *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 632, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961); *see also United States v. 8.41 Acres of Land*, 680 F.2d 388, 392 (5th Cir.1982) ("Federal courts have long held that an appropriate measure of damages in a partial-taking case is the difference between the value of the parent tract before the taking and its value after the taking.").

The Government contends that the "before-and-after method" should be used for two reasons. First, the Government submits that the placement of the sensors has had no impact on Plaintiffs' ability to develop any of the subject properties. According to the Government, sensors have been removed consistent with the obligations of the stipulation when Plaintiffs began to develop the affected parcels. Second, the Government argues that the sensors, and the easement for access to the sensors, have had no impact on the biological resources of Plaintiffs' properties or their value for mitigation purposes. To support its conclusion, the Government points to the fact that portions of the five parcels on which the Border Patrol admits to having placed sensors have been used for mitigation.

In contrast, Plaintiffs contend that the Government's easement is a temporary taking, and that the Court should use the well-established fair market value method to determine the value of the taking. The fair market rental value therefore would be what a hypothetical buyer and seller would have agreed upon in a free market exchange for the period of the taking. *See e.g., Kimball Laundry Co.*, 338 U.S. at 7, 69 S.Ct. 1434; *Yuba Natural Res. Inc.*, 904 F.2d at 1580.

■■■ Considering the two methods, the Court adopts Plaintiffs' proposed fair market value method as the most reasonable under the circumstances. The Government's "before-and-after-method" is better suited for other types of easements such as pipelines, transmission lines, or rights of access. Those types of easements are more permanent, and are more readily subject to "before-and-after" valuation. *See Va. Elec. & Power Co.*, 365 U.S. at 632, 81 S.Ct. 784 (1961). Conversely, the sensor easement potentially is in a state of flux. The burden of the easement on Plaintiffs depends upon how many of the fourteen sensors are deployed, where they are deployed, and how much Border Patrol access and pursuit activity is generated by them. The number of deployed sensors also is dependent on Plaintiffs' property development plans. Under the broad terms of the Government's stipula-

tion, the easement encompasses all 897 acres of Plaintiffs' five parcels of property. The Government's easement is not a simple cubic foot taking for each sensor, or a fixed property interest the width of a pipeline. A "before-and-after" valuation method therefore cannot be used. The Court views the fair market value method to be far more reasonable under the unique facts presented, although not at the same compensation level urged by Plaintiffs.

■ The Court is afforded ample leeway in determining the fair market value of the Government's sensor easement. In the temporary taking case of *Kimball Laundry,* the Supreme Court described the process of calculating fair market rental value as an "informed guess" of what a reasonable buyer would have paid a reasonable seller for the property interest taken by the Government. 338 U.S. at 6, 69 S.Ct. 1434 ("[S]ince a transfer brought about by eminent domain is not a voluntary exchange, this amount can be determined only by a guess, as well informed as possible, as to what the equivalent would probably have been had a voluntary exchange taken place."). The Supreme Court concluded in *Kimball Laundry* that, in cases where there is a frequent exchange of like property, "market price" becomes an "important standard of reference" for a court's determination of the fair market value of a rental that could have been obtained between a hypothetical buyer and seller. *Id.*

Plaintiffs' claim of $23,592,400, plus interest, is based upon a fair market value calculation for all parcels at a rate per acre per month ranging from $25 to $200. These rates are derived from comparisons made by Plaintiffs' expert, Mr. Randy Tagg, to 21 other transactions in the vicinity of Otay Mesa and throughout San Diego County during 2001 through 2009. (Tagg, Tr. 699–713; PX 271 at 105–08.) Of the 21 transactions, Mr. Tagg found eight of them (nos. 6 and 8 through 14) to be most comparable to the Government's sensor easement. (PX 271 at 108–11.) However, Mr. Tagg applied his rates for much longer periods than are conceded in the Government's stipulation, and to six other parcels (nos.2, 6, 7, 8, 9, 11) that are not included in the stipulation. When confined to the limits of the stipulation, Plaintiffs' claim is $8,282,240, plus interest. (Pls.' Post–Trial Br. at 7.) In the Court's view, this claim still is overstated. The rates per acre per month are too high, and the calculation is not keyed to the sensor installation date on each of the five parcels.

The Court finds two of Mr. Tagg's transactions (nos. 6 and 13) to be the most comparable to the Government's blanket, temporary, non-exclusive easement. (PX 271 at 108.) The two most comparable leases are: (1) a lease of 79 acres at $58 per acre from Kearny PCCP Otay 311 to the U.S. Navy for night parachute training; and, (2) a lease of 80 acres at $25 per acre from OMC Properties LLC to America's Extreme Sports for skydiving. *Id.* The skydiving lease specifically provides for the lessee's non-exclusive and changing use of the property:

> Lessee shall not require use of the entire 80 acres at any one time. Lessee understands and hereby acknowledges that Lessor shall develop the land for other uses during the term of this Lease and Lessor may reasonably request that Lessee limit their landing to certain areas within the 80 acres or provide Lessee with landing space on other land owned by Lessor located in the close proximity to 80 acres.

(PX 266(AAA)). Parachuters obviously cannot predict with precision where they will land on the leased property so greater acreage is leased than will actually be occupied or used at any one time. Similar to these two broad but minimally intrusive leases, the Government has taken an expansive easement over Plaintiffs' property to place and access a small device. Thus, the Court finds it most appropriate to use the rental rates of these properties, leased for activities similar in scope to those being carried out by the Government on Plaintiffs' property. To account for the difference in rental rates between the $58 price per acre in the Navy's parachute training lease and the $25 price per acre in Extreme Sports' skydiving lease, the Court has averaged these two prices to arrive at a $41.50 per acre per month. The Court has applied this per acre rental rate to each of the five parcels subject to the Government's easement. The Government's "lease" of each parcel runs from the date the first sensor was installed on that parcel, as set forth in the Defendant's stipulation, to October 2008, the damages end-date employed by Plaintiffs. As summarized in the chart below, the Court calculates the just compensation owed to Plaintiffs as $3,043,051.

## OTAY MESA DAMAGES CHART

| Parcel | Acres | Rental Rate/ Acre/Mo. | 1999 (9 Mos.) | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 (10 Mos.) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 89 | $41.50 | | | | | $14,774 | $44,322 | $44,322 | $44,322 | $44,322 | $36,935 |
| 3 | 393.6 | $41.50 | $147,010 | $196,013 | $196,013 | $196,013 | $196,013 | $196,013 | $196,013 | $196,013 | $196,013 | $163,344 |
| 4 | 160 | $41.50 | | | | | $26,560 | $79,680 | $79,680 | $79,680 | $79,680 | $66,400 |
| 5 | 120 | $41.50 | | | | | | $14,940 | $59,760 | $59,760 | $59,760 | $49,800 |
| 10 | 134.89 | $41.50 | | | | | | $22,392 | $67,175 | $67,175 | $67,175 | $55,979 |
| TOTAL | | | $147,010 | $196,013 | $196,013 | $196,013 | $237,347 | $357,347 | $446,950 | $446,950 | $446,950 | $372,458 |

GRAND TOTAL (without interest) = **$3,043,051**

E. *Plaintiffs Are Entitled to an Award of Interest Under The Contract Disputes Act*

 Plaintiffs must be compensated not only for the value of the Government's easement over its property but also for any delay in the Government's payment of that amount. *See NRG Co. v. United States*, 31 Fed.Cl. 659, 664 (1994). Again, the purpose of just compensation is to "insure that [the property owner] is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984). This Court has wide discretion in determining the appropriate interest rate to use when calculating just compensation. *See Tulare Lake Basin Water Storage Dist. v. United States*, 61 Fed.Cl. 624, 627 (2004) ("[N]o consensus has emerged with regard to the appropriate interest rate to be employed in just compensation cases . . . ."). Prior cases have used an array of different methods of calculating interest. *See, e.g., E. Minerals Int'l, Inc. v. United States*, 39 Fed.Cl. 621, 631 n. 13 (1997) (applying the tax overpayment rate set forth in 26 U.S.C. § 6621); *NRG Co.*, 31 Fed.Cl. at 670 (applying the Declaration of Taking Act rate set forth in 40 U.S.C. § 258e–1); *Formanek v. United States*, 26 Cl.Ct. 332, 341 n. 11 (1992) (applying the Contract Disputes Act rate set forth in 41 U.S.C. § 611). The Court's primary goal, however, is to employ an interest calculation which does not just "yiel[d] a higher or lower interest payment, but rather . . . is the more accurate measure of the economic harm of the property owners." *NRG Co.*, 31 Fed.Cl. at 670 n. 8.

Plaintiffs in the instant case offer three approaches for calculating the interest rate to be applied from the date of the taking: the Contract Dispute Act ("CDA") interest rate (41 U.S.C. § 611), the IRS Tax Overpayment interest rate (26 U.S.C. § 6621), or a Treasury Bond interest rate. (Pls.' Post–Trial Br. at 48–49.) Defendant counters that the Declaration of Taking Act interest rate (40 U.S.C. §§ 3114–3116, 3118) is the most appropriate interest rate to apply in Fifth Amendment takings cases. (Def.'s Post–Trial Br. at 43–46). Here, the Court concludes that the CDA's interest rate best compensates Plaintiffs for the economic harm they have incurred as a result of the Government's delay in paying Plaintiffs for its use of their property. If the Border Patrol originally had entered into a lease with Plaintiffs for the placement of sensors on the five parcels, such a lease would have been a binding contract. Accordingly, the CDA seems best suited to compensate Plaintiffs for interest on what should have been a contractual arrangement.

Plaintiffs also contend that the Court should award compound interest. The Court agrees. *See Vaizburd v. United States*, 67 Fed.Cl. 499, 504 (2005) ("Compounding we view as a routine means by which a reasonable person would protect themselves, over an extended period of time, from erosion of their investment."). Given the Government's decade-long delay in compensating Plaintiffs for their easement, an award of simple interest would undervalue the worth of Plaintiffs' property. *See Bowles v. United States*, 31 Fed.Cl. 37, 52 (1994) (finding that the Government's delay in payment of just compensation to the landowner warranted an award of compounded interest) (citing *Fla. Rock Indus., Inc. v. United States*, 23 Cl.Ct. 653, 658 (1991), *vacated and remanded on other grounds*, 18 F.3d 1560 (Fed.Cir.1994)). Moreover, this Court's precedent supports the use of a compounded CDA interest rate to calculate the delay component of "just compensation" in Fifth Amendment takings cases. *See, e.g., Whitney Benefits, Inc. v. United States*, 30 Fed.Cl. 411, 416 (1994); *Bassett, New Mexico, LLC v. United States*, 55 Fed.Cl. 63, 81 (2002). Thus, the Court awards Plaintiffs compounded interest for the period of the taking (April 1999 to October 2008) with the interest computation to be based on the CDA.

*Conclusion*

Using the Court's award of $3,043,051 in just compensation to Plaintiffs, the Court

**492**

requests the parties submit a joint filing on or before July 13, 2010 with the proper interest amount to be paid under the CDA. Counsel are asked to confer in advance of the due date to resolve any differences in the interest computation. If there are any disagreements that cannot be resolved, the Court may conduct a further hearing after receipt of the joint filing. The entry of judgment will be stayed pending the determination of the proper amount of interest to which Plaintiffs are entitled.

IT IS SO ORDERED.